GROSETH INTERNATIONAL, INC.,
and Clifford Groseth, Plaintiffs
and Appellants.

v.

TENNECO, INC., and J.I. Case
Company, Defendants and
Appellees.

GROSETH INTERNATIONAL, INC.,
and Clifford Groseth, Plaintiffs
and Appellants,

v.

INTERNATIONAL HARVESTER CO.,
Defendant and Appellee.

Nos. 15329, 15330.

Supreme Court of South Dakota.

Argued Nov. 17, 1986.

Decided July 15, 1987.

Supplement to Opinion, Sept. 30, 1987.
Rehearing Denied Nov. 2, 1987.

Steven M. Johnson and Celia Miner of Brady, Kabeiseman, Reade & Johnson, Yankton, for plaintiffs and appellants.

Joan F. Kessler and James L. Huston of Foley & Lardner Milwaukee, and John Simko of Woods, Fuller, Shultz & Smith, P.C. Sioux Falls, for defendants and appellees.

SABERS, Justice (on reassignment).

Groseth International, Inc. and Clifford Groseth appeal from summary judgments in favor of International Harvester Company, in one action, and J.I. Case Company and Tenneco, Inc., in the second action. The cases are consolidated on appeal pursuant to SDCL 15–26A–3. We affirm in part, reverse in part, and remand.

### Facts

Tenneco Inc. (Tenneco) is the parent company of J.I. Case Company (Case), an equipment manufacturing corporation. Until 1985, International Harvester Company (IHC) manufactured farm equipment, construction equipment, and trucks. Groseth International, Inc. (Groseth) is a closely held corporation located in Yankton, South Dakota. Until 1985, Clifford Groseth was a franchised dealer of IHC farm equipment.

As a result of economic depression in the agricultural economy and farm equipment operating losses, IHC's financial condition deteriorated. IHC began to search for potential buyers of its farm equipment division in 1982.

In 1984, IHC negotiated a purchase agreement with Case/Tenneco structured as a purchase and sale of assets. The acquisition covered selected assets and liabilities from IHC's North American group. The base purchase price was $246,700,000 cash. Although Case was the acquiring corporation, IHC received $161,300,000 of participating preferred stock of Tenneco.

IHC became Navistar International. While Navistar could no longer manufacture farm equipment, it could continue to market trucks under the name "International." Case's farm equipment line became "Case-International."

The IHC dealer network was of particular interest to Case/Tenneco since it offered a chance to immediately command an existing market. However, Case/Tenneco did not "acquire" the franchise network. Instead, it received "access" to IHC dealers, many of whom eventually received a Case franchise. In 400 "conflict areas," areas in which both Case and IHC dealerships were located, Case offered only one franchise contract. In nearly two-thirds of the conflict areas the IHC dealer received the franchise. In this case, however, the Case Implement dealer in Yankton, Mark's Machinery, was chosen over the IHC dealer, Groseth.

### THE FACTS MUST BE TAKEN IN THE LIGHT MOST FAVORABLE TO GROSETH FOR THE PURPOSE OF SUMMARY JUDGMENT

Groseth was a family-owned corporation which employed fifteen people. Pursuant to the franchise agreement with IHC, Groseth's employees attended service and sales schools, training sessions, sales meetings, and other requirements of the franchise agreement. Groseth abided by the terms and conditions of the franchise agreement.

In December 1984, Groseth was called to a meeting in Dallas, Texas, and notified by Case/Tenneco that Case would be acquiring IHC. Speakers at the meeting stated that cities where Case and IHC dealers existed were "conflict cities" and one dealership would be terminated. Case requested information concerning Groseth's business on December 14, 1984, and Groseth responded. However, the decision to close Groseth's business had already been made by Case on December 6, 1984.

Despite Case/Tenneco's assertion that there would be a "painstaking evaluation" of dealers in conflict cities, none of their representatives contacted Groseth to view

his business operation, inspect the business premises, evaluate the financial aspects of his business, or perform any investigation whatsoever concerning the nature of his business as an IHC franchisee. Termination decisions were not based on any market analysis or study.

Without warning or explanation, Case/Tenneco representatives came to Groseth's business on January 3, 1985, and informed Groseth that he was not to be awarded a franchise agreement and that his current dealer agreement with IHC was terminated. Contrary to the direct language of the IHC agreement, he was not given six months notice of his termination nor any opportunity to rectify any claim of breach of the agreement. He was denied information as to why his franchise was terminated.

Groseth was not allowed to have anyone else in the room with him when the Case/Tenneco personnel were present. They attempted to get Groseth to sign a termination agreement, which by its own terms, indicated that Case/Tenneco was terminating the IHC franchise with Groseth. It also contained provisions releasing Case, Tenneco, and IHC from any liability resulting from Groseth's termination and further offered a $10,000 bonus to dealers who would sign within ten days. Groseth refused to sign the termination agreement.

On January 31, 1985, Case/Tenneco acquired the assets of IHC in relation to its agricultural division. It acquired IHC's patents, trademarks, manufacturing facilities, personnel, and the North American dealership network of IHC franchisees. The purchase agreement between the defendants required Case/Tenneco to undertake negotiations with IHC dealers resulting in their termination. This was done, according to IHC officials, so that IHC franchisees would not attempt to require IHC to buy back their equipment and parts pursuant to the franchise laws of various jurisdictions and the IHC franchise agreement.

According to the chief executive officer of IHC, Mr. Lennox, all responsibilities concerning the IHC franchisees were turned over to and assumed by Case/Tenneco pursuant to the purchase agreement between those entities. From the time of consummation of the purchase agreement between those entities, Case/Tenneco undertook termination of hundreds of IHC franchisees throughout the United States, including Groseth in South Dakota. Case/Tenneco formed a group within its organization called the "transition task force." This group was composed mainly of Case/Tenneco officials who were internally referred to as a "swat team." They met with a clinical psychologist, hired by Case/Tenneco, in order to more effectively deal with franchisees they were to terminate. This group was to obtain franchisee signatures on termination agreements which would have released Case/Tenneco from statutory obligations such as those found under South Dakota's franchise law.

According to the IHC franchise agreement in effect at the time of Groseth's termination, specifically Section 25(c), Groseth was required to be given an opportunity to cure any supposed breach of his franchise agreement. He was also entitled to notice, of not less than six calendar months, of his termination period. None of the defendants complied with these provisions. Defendants made no study of South Dakota franchise laws. However, Case/Tenneco dealt differently with IHC dealers in other states. For example, in Wisconsin, a dealer received a termination letter from J.I. Case providing both notice and an opportunity to cure the alleged deficiency in market penetration.

Following termination of Groseth's franchise without compliance with the franchise agreement or South Dakota law, Groseth was unable to continue his operation as an IHC farm equipment dealer. His business is presently open, but engaged only in repair and service of farm equipment and the sale of trucks. He is no longer allowed to sell IHC farm equipment, parts, or service IHC goods under warranty. He effectively has been removed from the farm equipment business.

IHC claims it took no action to "terminate" Groseth. IHC merely "voluntarily

withdrew" from the agricultural equipment market after selling its agricultural equipment division to Case/Tenneco for nearly a half billion dollars.

### Groseth's Claims

Groseth claims that either IHC, or Case/Tenneco, or both, are liable for damages associated with losing the franchise and that the trial court erred in awarding summary judgment in both cases.

### Summary Judgment

Two questions must be asked in analyzing whether summary judgment is proper. First, are there "genuine issues as to any material fact?" SDCL 15–6–56(c). Second, is the moving party "entitled to a judgment as a matter of law?" *Id.* The moving party has the burden of proof. *Hamaker v. Kenwel-Jackson Machine, Inc.,* 387 N.W.2d 515 (S.D.1986). The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. *Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19 (1968); *Trapp v. Madera Pacific, Inc.,* 390 N.W.2d 558 (S.D.1986). Thus, summary judgment is appropriate to dispose of legal, not factual questions. *Hamaker, supra.*

GROSETH V. IHC: APPEAL # 15330

### 1. BREACH OF FRANCHISE AGREEMENT

Groseth argues that the trial court erred in granting summary judgment to IHC on Groseth's claim of breach of franchise agreement.

According to the terms of the franchise agreement IHC could unilaterally terminate the agreement only after written notice of termination. Such notice could not be issued *at all* unless: (a) the dealer, having breached certain duties and obligations, was given an opportunity to cure those defects, or (b) if in IHC's judgment, the dealer's trade area no longer offered a sufficient market for IHC goods. Furthermore, termination could not become effective until after six months from the date of such notice.

Section 2 of the franchise agreement further provided:

The agreement shall cover all those items of agricultural tractors, machines, equipment and attachments, which appear in the Agricultural Equipment Price List issued by the Company, and service parts. The company reserves the right to make additions to and eliminations from such List, including but not limited to reductions resulting from the discontinued production of a line or lines of such tractors, machines, equipment and attachments, without incurring any responsibility to the Dealer.

IHC argued, and the trial court agreed that Section 2 gave IHC the unrestricted right to discontinue its farm equipment business whenever in its judgment such event was advantageous or demanded as a result of severe economic hardship. As a result, the court concluded that Section 2 allowed IHC to discontinue production of all lines of farm equipment without incurring any liability to Groseth.

■ Generally, the court and not a jury construes contracts. *Lien v. Northwestern Engineering Co.,* 73 S.D. 84, 39 N.W.2d 483 (1949). We believe that the court erred as a matter of law in concluding that Section 2 authorized a complete discontinuation of all product lines. Section 2 did not state that IHC could discontinue all product lines without liability. Instead, the section allowed "additions to and eliminations from" and "reductions" to the "List" of products. While the "List" could constantly change, there was a basic assumption that there would always be some group of products being marketed by IHC. Arguably, by eliminating all product lines on the list, the list itself would no longer exist. However, the language in Section 2 clearly does not contemplate discontinued production of all agricultural equipment. Therefore, we conclude that IHC did not reserve the right to cancel the contract by operation of Section 2. Accordingly, summary judgment was improperly granted on this issue.

In its memorandum opinion the trial court indicated that even absent Section 2

of the franchise agreement it would discharge IHC from contractual liability to Groseth because of the frustration of purpose (commercial frustration) and commercial impracticability doctrines.

### A. Commercial Frustration

The Restatement (Second) of Contracts defines the doctrine of commercial frustration:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or circumstances indicate the contrary.

Restatement (Second) of Contracts § 265 (1981).

■ Three factors are necessary to establish commercial frustration.

> First, the purpose that is frustrated must have been a *principle purpose* of that party in making the contract. It is not enough that he had in mind some specific object without which he would not have made the contract. The object must be so completely the basis of the contract that, as both parties understand, without it the transaction would make little sense. (emphasis supplied)

Restatement (Second) of Contracts § 265, comment a (1981).

■ Under the first factor, there must be an investigation into the principal purpose of the contract and a determination of the frustrating event that destroys the primary basis of the contract. If the frustrating event was within the promisor's control or due to the promisor's "fault," then he is not excused. 18 Williston, *Contracts* § 1954 (1978); 17A C.J.S. *Contracts* § 464 (1963).

The second factor needed to establish commercial frustration is:

> [T]he frustration must be *substantial.* It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss. The frustration must be so severe that it

is not fairly to be regarded as within the risks that he assumed under the contract. (emphasis supplied)

Restatement (Second) of Contracts § 265, comment a (1981).

■ Under this factor, the degree of hardship is used as the standard for relief. In order that contracts may be relied on with certainty, frustration is limited to cases of extreme hardship and must be substantial. The fact that performance has become economically burdensome or unattractive is not sufficient to excuse performance. *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283 (7th Cir.1974); *United States v. Wegematic Corp.*, 360 F.2d 674 (2d Cir.1966); *Transatlantic Financing Corp. v. United States*, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966). A promise will not be discharged because the performance promised in return has lost value on account of unforeseeable supervening circumstances unless those circumstances nearly or quite completely destroy the purpose both parties to the contract had in mind. Williston on Contracts, § 1954 (1978). The question is whether the equities, considered in the light of sound public policy, require placing the risk of disruption or complete destruction of the contract's viability on one party or the other. *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47, 50 (1944).

Finally, the third element of commercial frustration is

> [T]he non-occurrence of the frustrating event must have been a *basic assumption* on which the contract was made. This involves essentially the same sorts of determinations that are involved under the general rule on impracticability. (emphasis supplied)

Restatement (Second) of Contracts § 265, comment a (1981).

■ Under the third factor, the Restatement adopts the central notion of Uniform Commercial Code § 2–615 (*See* SDCL 57A–2–615) of "a contingency the non-occurrence of which was a basic assumption on which the contract was made" in dealing with commercial frustration. Introductory Note to Chapter 11, Reporter's Note;

Rest.2d § 265, and comment a and b; Rest.2d § 261 and comment b.

b. *Basic assumption.* In order for a supervening event to discharge a duty under this Section, the non-occurrence of that event must have been a "basic assumption" on which both parties made the contract.... Its application is also simple enough in the cases of market shifts or the financial inability of one of the parties. The continuation of existing market conditions and of the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule stated in this Section.

Restatement (Second) of Contracts § 261, comment b (1981). Using the "basic assumption test" courts, in effect, imply a condition excusing both parties from performance. This is based upon the theory of an implied term which, in the eyes of the law, the parties themselves would have regulated by agreement if the necessity had occurred to them. *See Patch v. Solar Corp.,* 149 F.2d 558, 560 (7th Cir.1945), *cert. denied,* 326 U.S. 741, 66 S.Ct. 53, 90 L.Ed. 442 (1945); *119 Fifth Avenue, Inc. v. Taiyo Trading Co., Inc.,* 190 Misc. 123, 73 N.Y.S.2d 774, *aff'd* 275 App.Div. 695, 87 N.Y.S.2d 430 (1949). If the frustrating event was neither foreseen nor reasonably foreseeable, the promise was not in fact intended by the parties to extend to such a contingency. If the event was foreseeable when the contract was made, then the party will be presumed to have assumed the risk of its occurrence. 18 Williston, *Contracts* § 1954 (1978); 17A C.J.S. *Contracts* §§ 463(2), 464 (1963).

■ The application of the doctrine of commercial frustration, is a question of law, to be determined by the court from the facts of the case. *Glens Falls Indem. Co. v. Perscallo,* 96 Cal.App.2d 799, 216 P.2d 567 (1950). Here, the trial court found that IHC's losses of one million dollars a day due to the depressed farm economy threatened the company's survival. The court held:

Under such circumstances it would be commercially senseless to obligate I.H. to performance under its franchise agreement with Groseth. Consequently, the court finds that I.H.'s financial loss was of such a magnitude that it constitutes a supervening circumstance not fairly within the risks assumed under the

contract or within the contemplation of the parties at the time of the agreement, that it strikes at the very root of the agreement essentially destroying the purpose for which the contract was made, and that performance would result in extreme and unreasonable hardship to I.H. Thus, regardless of Section 2 of the I.H.-Groseth agreement, I.H. is discharged from performance of the franchise agreement under the frustration of purpose doctrine.

■ The circuit court's memorandum opinion closely matches analysis of the elements made by IHC: First, profit was the primary purpose of the dealership agreement. Second, the primary purpose was substantially frustrated. IHC had lost almost two billion dollars in shareholder equity between 1980 and 1982 due to write-offs from plant closings and actual operating losses, had lost almost one million dollars a day in 1984 from its agricultural division, and could possibly be bankrupt the following year if such losses continued. Third, there was a basic assumption of the parties that there would continue to be profits to justify IHC's presence in the market. Fourth, the economic downturn in the farm economy and IHC's losses were unforeseeable and not the fault of IHC.

The trial court agreed with the analysis in *Aluminum Co. of America v. Essex Group, Inc.,* 499 F.Supp. 53 (W.D.Penn. 1980) (ALCOA), that profit earning or loss avoidance can be the principle purpose of a contract. *See also Printing Industries Ass'n v. International Printing,* 584 F.Supp. 990 (N.D.Ohio 1984). We cannot accept the logic in *ALCOA, supra* at 77. All of the Restatement illustrations center on purposes other than making a profit. Furthermore, *ALCOA* broadens the scope of the frustration doctrine in a manner that further confuses the distinction between frustration and commercial impracticability.

In this case, the dominant purpose of the contract was to create a franchise mechanism for IHC to market its equipment. Paragraph one of the agreement stated that the general purpose of the agreement was to *establish Groseth as a dealer* of the goods covered under the agreement and to govern the relationships between the dealer and the company in *promoting the sales of those goods.* Certainly, it can be inferred from the dealer agreement and the surrounding circumstances that mutual

profitability was intended by the parties. Few commercial contracts are made in which a profit is not an object. However, there is no evidence that this was the basis of the contract realized by both parties at the time of making the contract. Reduced market share or economic losses by IHC would not destroy the purpose for IHC having a franchise network to sell and service its products.

The frustrating event cited by IHC and the memorandum opinion is the economic depression in the farm economy and the serious losses to IHC that resulted. Even if we agreed that this was the true cause, there is no evidence that economic downturn, stiff competition, or other problems that developed for IHC were unexpected and therefore not assumed risks. Moreover, even if there was no assumption of risk, the Restatement is clear that the continuation of existing market conditions and the financial situation of the parties are not ordinarily basic assumptions or implied conditions which must exist in order to enforce a contract. Restatement (Second) of Contracts § 261, comment b (1981); 17A C.J.S. *Contracts* § 464 (1963).

The actual frustrating event was IHC's decision to sell off its division assets and withdraw from the market. IHC was responsible for this event. If the frustrating event was within the promisor's control or due to the promisor's "fault," he is not excused. 18 Williston, *Contracts* § 1954 (3d ed. 1978); 17A C.J.S. *Contracts* § 463(2), 464 (1963). Since the frustrating event was a decision made by IHC, IHC cannot be discharged. *Martin v. Star Publishing Co.*, 50 Del. 181, 126 A.2d 238 (1956); *Williston, supra,* § 1960. Therefore, the doctrine of commercial frustration does not discharge IHC from its duty to perform under the franchise agreement.

### B. Commercial Impracticability

IHC also argues that it should be excused under the doctrine of commercial impracticability. In the trial court's discussion of commercial frustration, there appeared the following sentence:

> Given today's rapidly changing business climate, the more enlightened view should be that where massive financial losses and difficulty of compliance is so great as to be prohibitive, it amounts to such an impracticability as to constitute impossibility in legal contemplation excusing non-performance.

The authority for this cite is 84 A.L.R.2d at 112, which was the only reference to commercial impracticability offered by the trial court.

As a general rule, unexpected difficulty, expense, or hardship involved in performance will not excuse performance where performance has not become objectively impossible. Nevertheless, there may be excuse from performance where very greatly increased difficulty is caused by facts not only unanticipated, but inconsistent with the facts that the parties obviously assumed would likely continue to exist. *See American Trading and Production Corp. v. Shell Internat'l Marine Ltd.*, 453 F.2d 939 (2d Cir.1972); *Transatlantic Financing Corp., supra; Iowa Electric Light and Power Co. v. Atlas Corp.*, 467 F.Supp. 129 (N.D.Iowa 1978). The most important question is whether an unanticipated circumstance has made performance of the promise vitally different from what the parties contemplated when they entered the contract. *Williston, supra,* § 1931. This principle of allowing discharge due to extreme and unreasonable difficulty, expense, injury or loss involved is established in Restatement (Second) of Contracts, § 261, as the commercial impracticability doctrine.

The doctrines of commercial frustration and impracticability focus on different kinds of disappointment of a contracting party. Impracticability focuses on occurrences which greatly increase the costs, difficulty, or risk of the party's performance. Frustration, on the other hand, focuses on a party's severe disappointment caused by a frustration of his principle purpose in entering the contract. *ALCOA, supra* at 73. It is extremely difficult to separate and apply these two doctrines. Nevertheless, we note that the facts of this case are more properly analyzed under the test for severe impracticability.

At the time of breach, performance may have become vitally different from what the parties had contemplated when they entered the contract. Forcing IHC to continue its farm equipment operations merely to sustain its franchise contracts may have been impracticable. Although it was only speculated, another year of similar losses may have merely resulted in IHC's bankruptcy. The excuse of severe impracticability could therefore require that the risk that IHC's condition would

suffer severely not be thrown upon IHC. Simply allowing discharge, however, would not fairly allocate the unexpected risks that occurred in this case.

IHC may not have been entirely responsible for the financial condition of the company that developed, but IHC was responsible for selecting the attempted solution. There is a material issue of fact as to what the actual financial situation of IHC was at the time of sale. Most important, there is a question as to whether the parties could have terminated the contract by mutual agreement as provided in the contract. If IHC breached its contract by unilaterally terminating Groseth's franchise, the question is whether IHC could have avoided this breach by offering Groseth, Inc. a fair share in the moneys IHC received from the sale of its assets. There is also an issue as to what options, other than a sale of its assets, were available to IHC. A sale of assets was the obvious choice for IHC to escape liability to its franchise and at the same time allow Case/Tenneco to merely offer contracts to IHC dealers when it was advantageous for them. Therefore, we reverse the court's summary judgment on this issue and remand for a jury trial on the issue of impracticability.

## 2. BREACH OF SOUTH DAKOTA FRANCHISE LAWS

Groseth argues that not only did IHC breach its duty under the contract, it also breached a duty it owed under SDCL 37–5–3. In relevant part the statute provides: "It is a Class 1 misdemeanor for any manufacturer, ... *unfairly, without due regard to the equities of the dealer and without just provocation,* to cancel the franchise of any dealer in ... farm tractors, or farm implements." (emphasis supplied)

 The trial court held that this statute does not prevent a manufacturer from withdrawing from the market or insulate dealers from the economic realities of the market place. The court cited *St. Joseph Equipment v. Massey-Ferguson, Inc.,* 546 F.Supp. 1245 (W.D.Wis.1982), where a similar Wisconsin Fair Dealership Law was held not to require a franchisor to continue in business at a substantial financial loss so that the dealer might continue selling the franchisor's products. The trial court followed *St. Joseph, supra,* when it held that "good faith" economic considerations resulting in a decision to discontinue production satisfies the "just provocation" re-

quirement under SDCL 37–5–3. We do not believe that SDCL 37–5–3 requires IHC to remain in business. Nevertheless, a manufacturer cannot in effect terminate a farm equipment franchise by withdrawing from the market without incurring liability to its dealers unless the withdrawal is with "due regard for the equities of the dealer" *and* with "just provocation." If we were to accept the interpretation which the trial court borrowed from *St. Joseph,* then we would be making "just provocation" simply an issue of "good faith." A more honest approach would be not to ignore the plain meaning of "just provocation," but hold that the statute simply does not apply in such total and nondiscriminatory withdrawals. We can do neither.

 SDCL 37–5–3 does not provide an exception for the form or manner in which a manufacturer reaches his decision to terminate. It plainly requires "just provocation" which we believe requires some sort of misconduct or shortcoming on the part of the dealer. Improper termination is prohibited by the statute and is a misdemeanor. In the sense that it creates a duty on the part of the manufacturer for the protection of franchisees, a breach of that duty may be actionable at law for damages. *See Walz v. City of Hudson,* 327 N.W.2d 120 (S.D.1982). Since the record does not indicate that there was any dealer misconduct or shortcoming, we reverse and remand for a determination of the presence of any just provocation and remand for a determination of whether the dealer agreement was terminated without due regard for the equities of the dealer.

## 3. BREACH OF FIDUCIARY DUTY

 Groseth argues that the trial court erred in granting summary judgment to IHC on Groseth's claim of breach of a fiduciary duty. Groseth relied upon *Arnott v. American Oil Co.,* 609 F.2d 873 (8th Cir.1979). However, the trial court noted that since the decision in the *Arnott* case, the Eighth Circuit said that:

Inasmuch as the duty of "good faith and fair dealing" is inherent in every business relationship, it was unnecessary to the decision to label that duty as "fiduciary." In any event, *Arnott* does not stand for the proposition that the grant of a franchise of itself in all instances imposes on the franchisor *all* of the duties and responsibilities which traditionally pertain to a true fiduciary.

*Bain v. Champlin Petroleum Co.*, 692 F.2d 43, 48 (8th Cir.1982). As the trial court found, since the *Arnott* decision, most courts have refused to impose upon the franchise relationship anything more than a duty of good faith. Groseth does not allege facts giving rise to a fiduciary duty or indicate what fiduciary duties were allegedly breached by IHC. Not having established necessary facts or any material issues of fact, summary judgment was proper.

### 4. EMOTIONAL DISTRESS

 Groseth argues that the trial court erred in granting summary judgment to IHC on Groseth's claim for intentional infliction of emotional distress. This tort requires conduct exceeding all bounds usually tolerated by decent society and which is of a nature especially calculated to cause, and does cause, mental distress of a very serious kind. *Ruple v. Brooks*, 352 N.W.2d 652 (S.D.1984). Thus, a prima facie case involves: (1) an act by defendant amounting to *extreme* and *outrageous* conduct; (2) intent on the part of the defendant to cause plaintiff *severe* emotional distress; (3) the defendant's conduct was the cause in-fact of plaintiff's injuries; and (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct. *Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312 (1963).

 The trial court did not find any evidence of unreasonable conduct by IHC or any evidence that IHC's discontinuation of the Groseth franchise was intended or calculated to cause any mental distress. Since the undisputed facts do not establish a cause of action and Groseth does not raise genuine issues of material fact, summary judgment was proper.

### GROSETH V. CASE/TENNECO: APPEAL # 15329

### 1. LIABILITY OF CASE/TENNECO FOR IHC DEALERS

#### A. Express Assumption

 Groseth argues that IHC's contract liabilities to its dealers attached to Case/Tenneco by successor corporate liability. Generally, there is no successor liabili-

ty for a purchasing corporation when the acquisition is a purchase of assets. *Hamaker supra;* 15 Fletcher, Cyclopedia of Corporations § 7122 (1983). There are four exceptions:

(1) When the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability.

(2) When the transaction amounts to a consolidation or merger of the purchaser and seller corporations;

(3) When the purchaser corporation is merely a continuation of the seller corporation; or

(4) When the transaction is entered into fraudulently to escape liability for such obligations.

*Hamaker, supra* at 518.

 Groseth argues that the purchase agreement between IHC and Case/Tenneco calls for an express assumption of IHC's obligations to Groseth by Case/Tenneco. The purchase agreement between IHC and Case/Tenneco specifies the assets to be purchased and sold:

§ 1.1 *Sale and Purchase of Assets.*

. . . . .

(e) *Contracts.* Except as provided in article XIV,[1] all contracts and contract rights which are exclusively related to the Acquired Business ... except such as are described on Exhibit B as Excluded Assets.

[Exhibit B's excluded assets include: (e) Contracts: agreements with dealers and distributors *subject to Section 2.1(g) of the purchase agreement.*] (emphasis added—*see* § 2.1(g) below)

. . . . .

(g) *Assets Related to Sales Organizations and Dealers.* All other assets of Seller and its subsidiaries related to or used or held primarily in connection with,

(i) their organization of agricultural equipment dealers in North America[.]

In addition to listing the assets purchased, the contract also addressed liabilities assumed by Case/Tenneco.

§ 2.1 *Assumed Liabilities.*

. . . . .

(g) *Dealer Claims.* All liabilities arising out of any claim against Seller ...

---

**1.** Groseth claims that defendants have conceded that article XIV is not material to Groseth's case. Defendants deny any such concession.

brought by any dealer ... of the Seller ... which arises out of termination ... of the contractual relationship of Seller ... with such dealer ... or which otherwise results because of this Agreement or the transactions contemplated by this Agreement.

In questioning about Section 2.1 of the Agreement, Ed Hacker, one of the transition team members responsible for terminating dealers, testified as follows:

Q: And one of the transactions contemplated by that agreement was termination of dealers in conflict cities?

A: Certainly.

Additionally, the purchase agreement contains an express assumption of responsibility by Case/Tenneco for IHC dealers whether retained or terminated.

§ 5.2 *Dealer Arrangements....* in the event agreement has not been reached with any Dealer on the Closing Date as to the terms and conditions of such an arrangement, Purchaser will offer such Dealer a Purchaser Agreement for such period as may be reasonably required to attempt to reach such an arrangement.

In a slide presentation, James Ketelsen, chief executive officer of Tenneco, Inc., testified that "in addition to International Harvester, North American and world-wide dealership and field support organizations are now a part of Case."

Arthur O'Meara, corporate counsel for IHC, was questioned regarding the terminology contained in Section 5.2 of the purchase agreement.

Q: What was your understanding of the obligations Tenneco could assume pursuant to Section 5.2?

A: They assumed the obligation to make the decision as to which [dealers] would be surviving dealers. They assumed the obligation to bring the level of the sales and service agreement up to the level of IH. They assumed the obligation to compensate favorably those dealers who did not survive the transaction.

In summary, Case/Tenneco's claim that the Dealer Agreements were excluded as assets stands for little when the obligations relating to those Dealer Agreements were assumed. 15 Fletcher Cyclopedia Corp. § 7122 (Perm.Ed.1983); *Hamaker, supra.* Therefore, summary judgment was improper.

**B. Implied Assumption**

The actions of Case/Tenneco indicate that Case was acting in place of IHC and by implication, it assumed IHC responsibilities. Case exerted control over the IHC dealership contracts and treated the contracts as acquired assets. Groseth argues that Case/Tenneco not only assumed the responsibility and liability for IHC dealership contracts, they also assumed the responsibility for being fair in the negotiations with the dealers.

Case prepared an "IH Dealer Termination Agreement." The termination contract (written by Case) named the parties as Case and IHC franchisees, (such as Groseth). The contract provisions released *Case* not *IHC* from liability. Case assumed all responsibility for supply and buy-back of IHC supplies and whole goods. In fact, Case complied with the IHC franchise agreement by offering IHC dealers five percent more for parts than they offered exiting Case dealers. Case took over receipt of all payment for goods from IHC dealers. All settlement offers were made by Case, not IHC. This agreement was entitled "International Harvester Dealer Termination and Asset Purchase Agreement" and provided in part:

In addition, Case will also pay to Dealer the amount of $25,000.00 (which is intended to cover and reimburse Dealer for such items as signs, service manuals, parts and price lists, etc.) if Dealer signs and returns this Agreement to Case prior to Case's Acquisition of IH's Agricultural Equipment Business. This amount will be payable in accordance with Paragraph 3. If Dealer signs and mails this Agreement to Case within 14 days of Jan. 3, 1985, Case will pay to Dealer the additional amount of $10,-000.00. This amount will be paid within 14 days after Case's receipt of the signed Agreement.

Case/Tenneco argues that it has no liability to Groseth because it claims it *expressly excluded* IHC's "agreements with dealers and distributors." However, as indicated above, this was "subject to Section 2.1(g) of the purchase agreement" entitled Assumed Liabilities. Accordingly, for Case/Tenneco to argue that it did not expressly, impliedly, or factually assume IHC's obligation to IHC's dealers (Groseth) is strained at best and fiction at its worst.

Case/Tenneco also argues that IHC's dealer contracts were expressly excluded by description in Section XIV, which excluded from the purchase all IHC contracts that could not be assigned without the other party's consent. Case/Tenneco argues that since Groseth's contract with IHC barred assignment without Groseth's consent, which was never given, article XIV precluded Case/Tenneco from assuming IHC's role in Groseth's contract.[2]

> The IHC–Groseth agreement provides:
> 32. The agreement shall be binding upon the parties hereto, their heirs, executors, administrators, successors and assigns....
> This is a personal agreement, involving mutual confidence and trust, and it may not be assigned by either party without the written consent of the other party, *except that* the Company may, however, assign the agreement to any of its subsidiary or affiliated corporations, without the consent of the Dealer. (emphasis added)

Case/Tenneco's arguments that Groseth's required consent was important and could not be forced is strained when that consent

**2.** Article XIV, 14.1 states: "Notwithstanding anything herein contained to the contrary, *other than* with respect to the Assumed Liabilities by Purchaser of Seller's obligations under its agreements with agricultural equipment dealer as provided in Section 2.1(g) ..." (emphasis added) This language would appear to exclude the obligations to dealers listed in § 2.1(g) from the operation of Article XIV.

**3.** Article XIV, § 14.1 states: "... (b) ... In the case of contracts and rights, if any, which cannot effectively be transferred to Purchaser without the consent of ... any other person, ... Seller and Purchaser will each use all reasonable efforts to obtain such consents promptly." Therefore, if, in the alternative, article XIV is applicable, IHC and Case/Tenneco did not comply with the contract mandates. Neither IHC nor Case/Tenneco made any effort to obtain consent from Groseth.

**4.** *See Keller v. Clark Equipment Co.,* 715 F.2d 1280, 1289 (8th Cir.1983), *cert. denied,* 464 U.S. 1044, 104 S.Ct. 713, 79 L.Ed.2d 176 (1984), holding that the plain terms of the purchase agreement demonstrated the successor corporation's intent to assume liability for the predecessor's negligence in failing to timely file an application for a patent. ("That general rule [of successor nonliability] is inapplicable ... when the transferee expressly or impliedly agrees to assume the transferor's debts and liabilities."); *Wall v. Owens-Corning Fiberglas Corp.,* 602 F.Supp. 252, 255 (N.D.Tex.1985) ("A purchasing

was never requested. Obviously, given an opportunity, Groseth probably would have consented to be a dealer.[3]

More important are the dealer arrangements in Section 5.2 under article V entitled "Transactions Prior to Closing," which required Case/Tenneco to offer each of the dealers either (a) a new distributor or dealer agreement with respect to the acquired business at least as favorable to such dealer as existed with IHC or (b) an appropriate arrangement for the consolidation, relocation, purchase or termination of the dealer's operations on terms at least as favorable as such dealer would be entitled to receive upon termination under a seller agreement. In view of all of these provisions and article II on Assumed Liabilities, it was error to conclude that Case/Tenneco did not assume IHC's liabilities to Groseth.

Thus, Case/Tenneco expressly and impliedly assumed the obligations in a manner sufficient to charge them under the law with responsibility and liability to Groseth.[4] *Hamaker, supra.* Accordingly, it is not necessary to get to the questions of whether liability might also arise as a result of a de facto merger,[5] continuation, or fraud.

corporation cannot escape liability for the torts of the transferor corporation where the transferee corporation expressly or impliedly assumes the liabilities, or where the transaction is tantamount to a merger. (citations omitted)"), *Philadelphia Elec. Co. v. Hercules, Inc.,* 587 F.Supp. 144 (E.D.Pa.1984) (holding that the successor corporation assumed liability under a transfer of assets from the predecessor corporation, for the predecessor's contamination of ground and river water, even though the liability was unknown at the time of sale.); *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168 (5th Cir. 1985); *Johnson v. MPL Leasing Corp.,* 441 So.2d 904 (Ala.1983).

**5.** With respect to the question of merger, it is interesting to note that Case/Tenneco made premerger filings and the merger was approved by the Federal Trade Commission as of January 31, 1985. In addition, Donald Lennox, chairman of the board and chief executive officer of International Harvester wrote, "we believe the merger of the agricultural equipment group with J.I. Case makes a good and logical fit. The combination of our organization and dealers joined with Case should be a tough one to beat and further, under these circumstances, we believe the merger of Harvester and Case is logical and will create a much more viable competitor than IH could continue to be by itself in the market." Defendants attempted, after litigation began, to denominate the transaction as a "sale of assets." However, the evidence indicates a

Therefore, summary judgment was improper.

## 2. SUMMARY JUDGMENT WAS IMPROPER ON CASE/TENNECO'S OBLIGATION TO GROSETH UNDER SDCL CH. 37–5 (SOUTH DAKOTA FRANCHISE LAWS) AND FOR BREACH OF FRANCHISE AGREEMENT

These points are fully discussed under points 1 and 2 above relating to the liability of IHC.

## 3. TORTIOUS INTERFERENCE WITH CONTRACT

■ The tort of intentional interference with a business relationship requires only that there is an intentional interference with the business relationship which results in damage to the plaintiff to establish a prima facie case. Prosser, *Law of Torts*, § 130 at 953 (1971). Under the Restatement (Second) of Torts, § 766B (1979), the interference may consist of injury to either an existing contractual relation or a prospective contractual relation. South Dakota courts recognize the cause of action for intentional interference with a business relationship. *Lien, supra.*

■ Groseth asserts that (1) it had a contractual relationship with IHC and Case/Tenneco decided to terminate that relationship, and (2) that Groseth had prospective business relationships with customers who would patronize Groseth for warranty and repair work and that Case/Tenneco's actions made it impossible for Groseth to reap the benefits of those relationships. Donald Jacoby, a former vice president of sales with IHC and now an employee with Case/Tenneco, testified that Case/Tenneco would not allow a terminated dealer to continue to buy parts after ninety days from the notice of termination or do warranty work. Therefore, because there are genuine issues of material fact, summary judgment was improper.

## 4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ Although the general rule is that shareholders of a corporation do not have standing to participate in a suit for injuries to the corporation, *Vanderboom v. Sexton,*

460 F.2d 362 (8th Cir.1972), in this instance, Groseth does not assert claims for injuries done to the corporation but to himself individually. To this extent, it was error to grant summary judgment dismissing his cause for intentional infliction of emotional distress. If the testimony is true that defendants referred to terminated dealers as being "hit" by their swat team, it may be evidence of bad faith and unreasonable conduct and at a minimum, a question of fact for the jury to determine whether it was likely to result in emotional distress. *Ruple, supra.*

■ Case/Tenneco was well aware of the emotional distress that they were inflicting upon terminated dealers. There was testimony in the deposition of Dr. Chiron—the psychologist who was hired by Case/Tenneco to advise the transition team—that they knew that their conversations with the dealers could lead to emotional distress. Dr. Chiron recommended against terminating a dealer on a Friday afternoon because the person "might jump out a window." This testimony gives rise to fact questions making summary judgment improper.

## 5. DEFAMATION

■ Groseth claims that Case/Tenneco representatives stated to newspaper reporters that his business was not a good business and that "we can't afford to have a bad dealer out there." The implication was that Groseth was not a fit and proper dealer. Groseth claims a significant loss in numbers of sales and damage to the reputation and good will he had established over a long period of time. Whether or not the statements are defamatory raises a genuine issue of material fact precluding summary judgment. SDCL 20–11–4(3) and (5); *Bego v. Gordon,* 407 N.W.2d 801 (S.D. 1987); *Heritage Optical Center, Inc. v. Levine,* 137 Mich.App. 793, 359 N.W.2d 210 (Mich.App.1984).

## 6. BREACH OF CLAIMED FIDUCIARY DUTY

The trial court did not err in granting summary judgment to Case/Tenneco on Groseth's cause of action for a breach of fiduciary duty, because no fiduciary duty existed. *See* point 3 *supra,* relating to the liability of IHC.

merger. Both points are sufficient by themselves to raise a genuine issue of material fact as

to the question of merger and would require resolution by the fact finder, not by the court.

We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this decision.

MORGAN and HENDERSON, JJ., concur.

WUEST, C.J., and FOSHEIM, Ret.J., concur in part and dissent in part.

MILLER, J., not having been a member of the court at the time this action was submitted to the court, did not participate.

WUEST, Chief Justice (concurring in part, dissenting in part).

I agree with the majority opinion as to I.H. I disagree with the majority, however, as to assumption of liability by Case/Tenneco and other claimed causes of action.

### I.

The majority holds that Case and Tenneco expressly assumed responsibility for I.H.'s dealership contracts by provisions in the purchase agreement. Exactly the opposite occurred. The relevant provisions are as follows:

## ARTICLE I: ASSETS TO BE PURCHASED AND SOLD

1.1 *Sale and Purchase of Assets....* all of the right title and interest of Seller and of each of its subsidiaries in the following described assets, properties and rights:

(e) *Contracts. Except as provided in Article XIV,* all contracts and contract rights which are exclusively related to the Acquired Business or which are related to the Acquired Business and to any other business of Seller but are necessary for the continuation of the Acquired Business following the Closing, except such as are described on Exhibit B as Excluded Assets. (Emphasis added).

## EXHIBIT B: EXCLUDED ASSETS

The following are *Excluded Assets* and as such are not included in the Acquired Business:

(e) Contracts:—*Agreements with dealers and distributors subject to Section 2.1(g) of the Purchase Agreement.*

## ARTICLE II: ASSUMED LIABILITIES

2.1 *Assumed Liabilities.* As of the Closing Date, Purchaser shall assume and thereafter pay, perform and discharge the following obligations, claims and liabilities of seller and its subsidiaries and no other (the "Assumed Liabilities").

(g) *Dealer Claims. All liabilities arising out of any claim against Seller or any of its subsidiaries brought by any dealer or distributor in the United States or Canada of the Seller or International Harvester Canada Limited,* and distributor of International Harvester Export Company, or any dealer or distributor of Case or any of its subsidiaries *which arises out of termination after the date of this Agreement of the contractual relationship of Seller,* Case or the Purchaser (if Purchaser is not Case) with such dealer or distributor (whether by the dealer or distributor or by Seller, Case or Purchaser (if purchaser is not Case) or any of their respective subsidiaries) or which otherwise results because of this Agreement or the transactions contemplated by this Agreement. (Emphasis added).

## ARTICLE V; TRANSACTIONS PRIOR TO CLOSING

5.2 *Dealer Arrangements.* Purchaser shall, as soon as practical after the date hereof, notify the agricultural equipment distributors and dealers of Seller, International Harvester Canada Limited and International Harvester Export Company (the "Dealers") that it intends, within 50 days thereafter, to offer to each of the Dealers, effective as of the Closing Date, either (a) a new distributor or dealer agreement (a "Purchaser agreement") with respect to the Acquired Business which will be at least as favorable to such Dealer as the current form of distributor or dealer agreement used by Seller and such subsidiaries (a "Seller agreement"), or (b) an appropriate arrangement for the consolidation, relocation, purchase or termination of the Dealer's operations on terms at least as favorable as such Dealer would be entitled to receive upon termination under a Seller Agreement, and, in the event agreement has not been reached with any Dealer on the Closing Date as to the terms and conditions of such an arrange-

ment, Purchaser will offer such Dealer a Purchaser Agreement for such period as may be reasonably required to attempt to reach such an arrangement. . . .

## ARTICLE XIV: LIMITATION ON ASSIGNMENT AND ASSUMPTION

14.1 *General.* Notwithstanding anything herein contained to the contrary, other than with respect to the Assumed Liabilities by Purchaser of Seller's obligations under its agreement with agricultural equipment dealers as provided in Section 2.1(g),

(a) Seller shall not assign any rights and Purchaser shall not assume any liabilities or obligations under contracts, agreements, leases, commitments, licenses, franchises, permits, authorizations, concessions, or other items included in the Purchased Assets as to which requisite consents to the assignment and assumption thereof have not been obtained or Purchaser is not provided the full benefits thereunder; . . . .

Summary judgment is appropriate to dispose of legal questions, not factual questions. *Hamaker*, supra. As the majority has already noted, contract interpretation is generally a question of law for the trial court. *Lien, supra.* The trial court's conclusion was not erroneous as a matter of law. Analysis of all relevant provisions in the purchase agreement indicates that Case/Tenneco expressly limited its potential liability. The agreement did not create rights enforceable by or for the benefit of third parties to the agreement. Furthermore, the purchase agreement limited the assumption of existing obligations held by I.H. Since there is no genuine issue of material fact, the interpretation of the contract was appropriately decided by summary judgment.

Section 5.2 required Case and Tenneco to notify the I.H. dealers that Case would either (a) offer them a new Case franchise, or (b) make arrangements for those I.H. dealers that Case decided not to offer a franchise to. This section created contract duties for Case and contract rights belonging to I.H. Groseth did not receive third party beneficiary rights. Breach of section 5.2, therefore, gives I.H., *not Groseth,* a cause of action against Case and Tenneco.

Section 1.1 included all contracts and contract rights necessary for Case to continue the acquired business. However, paragraph (e) excepted agreements with dealers (Exhibit B). In addition, paragraph (e) excepted assumption of liabilities under franchises (Section 14.1).

Both Exhibit B and Section 14.1 were subject to section 2.1(g). Section 2.1(g) does not, as the majority states in footnote 2, create obligations for Case and Tenneco with corresponding rights in I.H.'s *dealers.* Section 2.1(g) is an indemnity provision only, requiring Case and Tenneco to *indemnify I.H.* for liability incurred on claims brought by any I.H. dealer arising out of termination or otherwise resulting from the transaction. Thus, any potential cause of action against Case/Tenneco lies with I.H., not with Groseth.

As the majority opinion points out, Case/Tenneco did not "acquire" the I.H. franchise network. Instead, Case/Tenneco received "access" to those I.H. dealers that it wished to offer a Case dealership agreement. Tenneco and Case did not enter a franchise agreement with Groseth. Nor did they expressly assume any duties to Groseth or impliedly do so by their assuming the disposition of Groseth's franchise pursuant to their agreement with I.H. Therefore, Case/Tenneco cannot be liable for I.H. breach of any duties I.H. owed to Groseth under its franchise agreement.

## II.

The majority holds that Case/Tenneco breached a duty they owed to Groseth under our franchise laws. I disagree. SDCL 37-5-3 covers wrongful termination. How can the majority declare that I.H. was the party that terminated Groseth's franchise, then at the same time hold that Case/Tenneco was the terminating party? If, as the majority correctly concludes, I.H. may be liable in damages for terminating Groseth, then I.H. is the party responsible for terminating Groseth's I.H. franchise, not Case/Tenneco.

Case/Tenneco did not offer Groseth a Case dealership. Case did agree to perform certain duties for I.H. that I.H. owed to its dealers. Case agreed to purchase

dealer inventory. Case also agreed to wind-up the operations of I.H. dealers not offered a Case franchise on terms as favorable as the dealer would be entitled under I.H.'s franchise agreements. Again, any failure on the part of Case/Tenneco is actionable by I.H. but not Groseth. Whatever duties Case/Tenneco agreed to perform on behalf of I.H., the fact remains, it was I.H.'s decision to sell off its division assets and withdraw from the market that terminated Groseth's franchise. There can be only one terminating party, and that party was I.H. The majority, however, finds that I.H. terminated Groseth's franchise and then later finds that Case/Tenneco terminated Groseth's franchise. That is inconsistent.

### III.

Groseth argues that Case/Tenneco is liable because if there was not an actual merger, then there is still liability by operation of law since the asset acquisition amounted to a "de facto" merger or consolidation. The majority opinion finds those issues irrelevant since it has concluded that Case/Tenneco is liable on other grounds. Nevertheless, the majority comments in footnote 5 that the evidence indicates an actual merger took place.

The majority states in footnote 5 that it is interesting to note that Case/Tenneco made premerger filings. While premerger filings were made as required under the Hart-Scott-Radino Antitrust Act of 1976, 15 U.S.C. § 18A, "premerger notification" is required for all asset acquisitions, whether a purchase of assets or an acquisition by merger or consolidation. Just because there were premerger filings does not mean that an actual merger took place. The record is void of *any* evidence of a merger actually taking place.

Furthermore, Groseth has not established the elements necessary to find a "de facto" merger. The elements required for a de facto merger are: (1) continuity of business operations between the transferor corporations and the transferee corporation, including continuity of employees, location, and assets; (2) continuity of shareholders; (3) cessation of operations by the transferor corporation and dissolution with-

in a short time; and (4) assumption by the transferree corporation of those liabilities of the transferor corporation which are necessary for the continuation of normal business operations. *Fletcher, supra,* citing *Cyr v. B. Offen & Co., Inc.* 501 F.2d 1145 (1st Cir.1974). *See, Shannon v. Samuel Langston Co.,* 379 F.Supp. 797 (W.D. Mich.1974); Cf. *Turner v. Bituminous Cas. Co.,* 397 Mich. 406, 244 N.W.2d 873 (1976). If the transfer of assets is paid for in cash, the transaction is generally considered to be a bona fide sale of assets. If the purchasing corporation paid for the assets by issuing stock to the seller corporation, the transaction is usually considered a de facto merger. 13A Fox, Business Organizations § 25.04[2]. However, in such cases there is a transfer of common stock to the selling corporation's stockholders. *See Farris v. Glen Alden Corp.,* 393 Pa. 427, 143 A.2d 25 (1958); *Applestein v. United Bd. & Carlton Corp.,* 60 N.J.Super. 333, 159 A.2d 146, *aff'd* 33 N.J. 72, 161 A.2d 474 (1960).

Some courts have held where a particular corporate combination is in legal effect a merger or consolidation, although the transaction may be labeled otherwise by the parties, such transaction is a de facto merger so as to confer upon dissenting shareholders the right to receive cash payments for their shares. 15 Fletcher, *supra,* § 7045.1 (1983); *See, Rath v. Rath Packing Co.,* 257 Iowa 1277, 136 N.W.2d 410 (1965). The purpose of the de facto merger doctrine is primarily to protect the interests of shareholders who dissent from a transaction such as a sale of corporate assets and stock acquisitions, which ultimately produces the same result as a merger. *Fletcher, supra.*

The de facto merger theory has also been used in product liability cases against successor corporations *Fletcher, supra,* § 7123.5; *See, Turner v. Bituminous Cas. Co., supra.* Public policy grounds have been advanced in favor of holding successor corporations liable for injuries caused by their predecessor's products. The successor corporation, having reaped the benefits of continuing its predecessor's product line should be made to bear some of the burdens of continuity; there being no rational basis for treating a cash purchase or corporate assets any differently from an

acquisition of assets for stock. *Fletcher* § 7123.5. This court refused to apply the doctrine in *Hamaker, supra.*

Groseth does not establish the four elements we have cited which are required for a de facto merger. Groseth's case for de facto merger fails as a matter of law.

Groseth also argues that the transaction amounted to a "mere continuation" of I.H. Except for the *Hamaker* case, Groseth gives no other cases in support of his theory. *Hamaker* stated that a key element of a continuation is a commonality of officers, directors and stockholders in the predecessor and successor corporation. There is no evidence of this here. While Case retained many I.H. employees, no I.H. officers or directors became officers or directors of Case or Tenneco. Nor has Groseth provided any evidence that the shareholders of I.H. are now shareholders of Tenneco.

### IV.

The majority holds Case/Tenneco may be liable for tortious interference with a business relationship claiming a jury might find that Case and Tenneco tortiously interfered with the Groseth-I.H. contract by terminating Groseth. I disagree. *Case/Tenneco did not terminate Groseth's I.H. franchise.* There is simply no basis for finding Case/Tenneco liable under this theory when in fact it was I.H.'s decision to cease operations which ended Groseth's ability to further sell and service I.H. farm equipment.

### V.

The majority holds summary judgment should not have been granted on Groseth's action for intentional infliction of emotional distress. I disagree. While Case/Tenneco officials did notify Groseth that he would not be offered a Case franchise, there is no evidence of any extreme or outrageous conduct intended to cause severe emotional distress. *See Ruple*, 352 N.W.2d 652; *Alsteen*, 124 N.W.2d 312.

### VI.

Groseth complains that he was defamed in two newspaper articles. Again, as with the torts previously discussed, the defamation issue was decided by the trial court as a matter of law. In one article a Tenneco official said "We're taking on John Deere, we can't afford to have a bad dealer out there." In the other article, a Case official explained that Case considered many factors in determining the best dealer, and Groseth argues since he was not the one chosen this article necessarily implies that he was a bad dealer.

With respect to the first article, the statement does not refer to the plaintiff personally. *See, Brodsky v. Journal Publishing Co.*, 73 S.D. 343, 42 N.W.2d 855 (1950). No action lies for defamation when directed at a large group of persons. *See Schuster v. United States News and World Report*, 602 F.2d 850 (8th Cir.1979). With respect to the second article, which dealer is best could be considered a matter of opinion. Opinion is not actionable for defamation, and whether a statement expresses an opinion is a question of law. *See Gertz v. Robert Welch, Inc.* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Both area dealers could be outstanding, but only one dealer was chosen to remain. Again, this issue also contains no genuine issues of material fact.

I am hereby authorized to state that FOSHEIM, Retired Justice, joins in this concurrence in part and dissent in part.

SABERS, Justice.

*Supplement to Opinion for Clarification Purposes Only*

The opinion in the above-entitled appeal was handed down on July 15, 1987, and appellees have filed their request for reconsideration upon various grounds which the majority of the court does not find to be persuasive. It appears, however, that language in the opinion on # 15329, relating to the liability of Case/Tenneco for IHC dealers with respect to (a) express assumption and (b) implied assumption may be subject to misunderstanding and that clarification is appropriate.

The language in the opinion must be considered in the context of the issue of the propriety of summary judgment in favor of Case/Tenneco against Groseth, not the pro-

priety of summary judgment for Groseth against Case/Tenneco. Nor was it intended to imply that the latter was proper. Case/Tenneco's liability, if any, on these issues is for the jury to determine on proper instructions.

With this clarification, the opinion as handed down is in all other regards reaffirmed.

MORGAN, J., concurs.

HENDERSON, J., concurs specially.

WUEST, C.J., and FOSHEIM, Retired Justice, dissent.

MILLER, J., not having been a member of the court at the time this action was submitted to the court, did not participate.

HENDERSON, Justice (specially concurring).

Spiritually, I agree with the "Supplement to Opinion for Clarification Purposes Only." However, I disapprove of this type of appellate procedure in the South Dakota Supreme Court. SDCL 15–24–4; SDCL 15–30–5.

Per the Clerk of Court's docket, this case was to be remitted on August 19, 1987; once a case had been remitted, this Court loses jurisdiction and cannot recall it except in case of fraud, mistake, or inadvertence. *Lesmeister v. Dewey County,* 75 S.D. 360, 65 N.W.2d 136 (1954). This case, per the Clerk's docket, has not been returned to the lower court. SDCL 15–30–11. Per SDCL 15–30–5, a rehearing has not been granted, yet a "Supplement to Opinion for Clarification Purposes Only" is rendered.

Are we adopting a new type of appellate procedure in the Supreme Court whereby we officially change an opinion without benefit of granting a petition for rehearing? If so, I object to same, absent an applicable appellate procedural rule. Sources of appellate procedure have, historically, been by statutes *or* Supreme Court Rules. Later, the rules become "codified." Appeals are a procedure. Appeals are creatures of statute. *Investment Rarities, Inc. v. Bottineau County Water Resource,* 396 N.W.2d 746, 748 (N.D.1986). *Accord: Spanish Wells Prop. Owners Ass'n v. Board of Adjustment,* 357 S.E.2d 487, 488 (S.C.App.1987), reflecting that appeals are creatures of statute and are unknown to the common law. If this Court will now, in futuro, modify its previous decision by "Supplement to Opinion for Clarification Purposes Only," we are striking out on uncharted waters. In my opinion, it would be wise, before this type of opinion is issued, that both parties be granted oral input which they have not, heretofore, had upon rehearing.

Expressing these views, I do not forsake an inherent power of this Court to rectify obvious technical errors on opinions therebefore announced and filed. We are going, in this case, beyond superficially treating a technical error by correction. We are modifying this opinion by deviation of thought process—from the previously expressed opinion. Therein, we subjectively treat the merits differently.

WUEST, Chief Justice (dissenting).

I still dissent and would grant the petition for rehearing. However, I have no objection to the majority clarifying their opinion.

I am hereby authorized to state that FOSHEIM, Retired Justice, joins in this dissent.