# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3793

_____

Wilma Miller, doing business as          *
Double Diamond Construction,             *
                                         *
          Plaintiff-Appellee,            *
                                         *   Appeal from the United States
     v.                                  *   District Court for the
                                         *   District of South Dakota.
Mills Construction, Inc.; Van Tol        *
Surety Company, Inc.,                    *
                                         *
          Defendants-Appellants.         *

_____

Submitted:  October 24, 2003

Filed:  December 18, 2003
_____

Before LOKEN, Chief Judge, LAY and HEANEY, Circuit Judges.
_____

LAY, Circuit Judge.

Wilma Miller, doing business as Double Diamond Construction ("Double Diamond"), filed suit against Mills Construction, Inc. ("Mills") and its surety, Van Tol Surety Co., Inc. ("Van Tol"), alleging that Mills failed to compensate Double Diamond for work performed under a subcontract between Double Diamond and Mills. The district court found in favor of Double Diamond in the amount of $83,723 and awarded prejudgment interest in the amount of $33,504.93. Mills and Van Tol appeal. We affirm.

## I. BACKGROUND

Mills, a general contractor in Brookings, South Dakota, contracted with the City of Brookings to construct the Brookings AgriPlex, a series of buildings to be used for various purposes. One of the buildings to be constructed was a steel clear span arena 286 feet long by 209 feet wide. Due to the building's size and the fact that its construction would require the use of cranes, Mills decided to subcontract with a steel erection company for construction of the arena. Double Diamond, a steel erection company located in Lincoln, Nebraska, submitted a bid for the project, which Mills accepted. The parties entered into a subcontract dated March 18, 1998, under which Double Diamond agreed to provide the labor and equipment and Mills agreed to provide the prefabricated steel and other component parts for the building. Mills obtained the prefabricated steel for the building from American Buildings Company ("ABC"). Mills agreed to pay Double Diamond a total of $209,875 under the subcontract.

Double Diamond had to construct the building in two phases. The first phase, called the red-iron phase, involved erecting the building's frame. Generally, this phase involves setting side-wall columns onto concrete foundations, bolting them down, and bracing them with struts, pipe braces, and girts. Once the side-wall columns are erected, steel mainframes or rafters are set onto the columns and braced together with purlins, pipe braces, and x-bracing. The second phase is the steel-sheeting phase, which involves attaching metal sheeting to the frame to form the sides and roof of the building. Double Diamond never reached the second phase of construction because the structure collapsed before any sheeting could begin.

Under the subcontract, the delivery of materials was to begin the week of April 6, 1998. However, Mills, through ABC, did not make its first delivery until April 15, 1998, and some of the materials needed for the early stages of the building were not delivered until later shipments. As a result, construction was delayed. When Double Diamond was able to begin working on the building, it discovered numerous

problems with the component parts supplied by Mills. Many of the steel components did not fit together properly, some of the mainframes were twisted, and other parts were missing or the wrong length.

Double Diamond reported the problems to Mills, who told Double Diamond to contact ABC directly. Double Diamond made numerous calls to ABC, but ABC did not resolve the problems. On May 12, 1998, Double Diamond ceased working on the project and informed Mills and ABC that nothing else could be done until the problems were corrected. On May 14, 1998, Wilma Miller wrote a letter to Mills, ABC, the City of Brookings, and the project architects, in which she recounted the problems encountered during construction and expressed concern about the structural integrity of the structure.

On May 15, 1998, Dave Roberts, an ABC representative, visited the construction site to examine the structure. A videotape of his inspection documented the many problems with the structure and materials. Before leaving the site, Roberts concluded that the structure did not need additional bracing and would be fine unless hit by a tornado. Later that evening, the structure collapsed in the wind. A climatologist testified that the wind speed at the approximate time of the collapse was thirty-five miles per hour, but he also noted that an observer at the scene reported wind speeds of nearly fifty miles per hour at the time of the collapse.

After the collapse, Double Diamond submitted to Mills an invoice dated May 21, 1998, in the amount of $119,928 for work completed on the project up to the date of collapse. The amount of the invoice was based on Double Diamond's estimate that phase one of the construction had a contract value of $149,910 and that Double Diamond had completed eighty percent of the work on phase one. Mills previously had paid Double Diamond $20,000 on an invoice dated April 23, 1998. Mills paid Double Diamond $50,000 in response to the May 21st invoice but refused to pay any more. On June 30, 1998, Double Diamond informed Mills that it would not return

to work on the project unless Mills paid the balance due on the $119,928 invoice and executed a new contract with Double Diamond for completion of the project. When the parties did not reach a new agreement, Mills completed the project on its own.

Mills submitted a claim to its insurer for the damages it sustained when the building collapsed. In its claim, Mills included Double Diamond's $119,928 invoice plus $6,500 for additional move-in costs. In a June 18, 1998, letter from Mills to its insurance agent, Mills' project manager explained why these costs were reasonable. Mills' insurer approved $103,230.50 for structural steel erection plus nearly sixteen percent for profit and overhead, which amounted to approximately $119,600.

On February 22, 1999, Double Diamond filed what amounted to a breach-of-contract claim against Mills, seeking damages in the amount of $139,875. Double Diamond later amended its complaint to add an alternative theory of recovery of the same amount based on quantum meruit. Mills denied liability and asserted counterclaims based on negligence and breach of contract for failure to construct in a good and workmanlike manner. One of Mills' affirmative defenses was that Double Diamond breached the contract and was not entitled to recover because it voluntarily discontinued work on the project after the collapse, and failed to return to work despite numerous requests by Mills.

Following a bench trial, the district court held that Mills breached the contract by failing to provide the appropriate materials. The district court stated that the sheer number of problems made it impossible for Double Diamond to perform under the contract. The district court also found that the collapse was not the result of negligence on Double Diamond's part and that Mills could not maintain an action against Double Diamond for breach of contract because Mills did not substantially comply with its obligations under the contract. Even if Mills could maintain an action against Double Diamond, the district court found that Double Diamond's performance under the contract was not substandard.

The district court awarded Double Diamond damages of $49,928, after finding that Double Diamond proved by a preponderance of the evidence that eighty percent of the red-iron work was completed for a total amount of $119,928 and subtracting the $70,000 previously paid. The district court also awarded consequential damages of $33,795 for down-time charges from the date of collapse through the end of the contract term, finding that the damages were proximately caused by Mills' breach.[1] After entry of judgment, the district court amended the judgment to add $33,504.93 in prejudgment interest.

## II. DISCUSSION

*Breach of Contract*

Mills and Van Tol[2] assert on appeal that the district court erred in its determination of breach of contract because this claim was not included in Double Diamond's amended complaint. The claims in Double Diamond's amended complaint are based on Mills' refusal to pay the amount due to Double Diamond for its work on the building through the date of collapse, not on Mills' failure to provide appropriate materials. While we acknowledge that Double Diamond's amended complaint does not allege that Mills breached the contract by providing defective building materials, we conclude that the parties tried the issue by consent.

Federal Rule of Civil Procedure 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." A party's consent may be implied "if evidence to support the claim was introduced at trial without

---

[1]The down-time charges included expenses for wages and payroll costs, office expenses and administration, insurance coverage, contractor profit margin, and equipment costs.

[2]For convenience, we will hereafter use "Mills" when referring to the arguments of Appellants Mills and Van Tol.

objection." Shen v. Leo A. Daly Co., 222 F.3d 472, 479 (8th Cir. 2000). Thus, under Rule 15(b), the district court could consider any theory of liability tried and argued by the parties, regardless of whether it was included in the pleadings. See Karlen v. Ray E. Friedman & Co. Commodities, 688 F.2d 1193, 1197 n.3 (8th Cir. 1982).

A review of the record reveals that Double Diamond argued the issue of Mills' failure to provide appropriate materials under the contract and introduced evidence to support a claim that this amounted to a breach of contract. Although Mills did not expressly consent to try the issue of breach of contract based on failure to provide appropriate building materials, its consent, nevertheless, may be implied from its failure to object to the introduction of such evidence. Therefore, we conclude the district court properly considered and decided the issue of whether Mills breached the contract by failing to provide appropriate materials.

*Material Breach*

On appeal, Mills argues that the district court erred because it did not find that Mills' failure to provide appropriate materials was a material breach of the contract. Mills suggests that without a finding of material breach, Double Diamond was not entitled to recover any damages.

A material breach of contract allows the aggrieved party to cancel the contract and recover damages for the breach. 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2002). However, if the breach is not material, the aggrieved party may not cancel the contract but may recover damages for the nonmaterial breach. Id. Under South Dakota law, a material breach is one that "would defeat the very object of the contract." Icehouse, Inc. v. Geissler, 636 N.W.2d 459, 465 (S.D. 2001) (quoting Thunderstik Lodge, Inc. v. Reuer, 585 N.W.2d 819, 825 (S.D. 1998). Whether a party's conduct amounts to a material breach is a question of fact. Id.

The district court found that Mills breached the contract by failing to provide appropriate materials, but it did not use the term "material" to describe Mills' breach. The object of the contract in this case was the construction of the arena by a specified date. Mills' failure to provide suitable building materials prevented proper construction of the building and made the structure vulnerable to collapse. As the district court noted, the record is replete with evidence of problems with the materials supplied by Mills prior to the collapse. These problems eventually required Double Diamond to stop working on the building because nothing more could be done until the problems were corrected. The sheer number of problems with the materials led the district court to find that it was impossible for Double Diamond to perform under the contract. The record also contains evidence that Double Diamond notified Mills and ABC of the problems on several occasions, thereby providing Mills with an opportunity to cure the deficiencies.

On these facts, we conclude that a finding of material breach is implicit in the district court's finding that Mills breached the contract by failing to provide appropriate materials. See Horton v. Horton, 487 S.E.2d 200, 204 (Va. 1997) (upholding ruling that one contracting party's refusal to perform obligations under the contract was a material breach because the breach defeated the essential purpose of the contract); Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 819 (Mass. 1991) (rejecting contention that trial judge's finding of breach of contract was not a material breach where one party's refusal to approve development plan in violation of contract terms made other party's duty to begin performance of contract by specified date impossible); Clevert v. Jeff W. Soden, Inc., 400 S.E.2d 181, 183 (Va. 1991) (finding that "building contractor defaults in the performance of his contract if he furnishes defective materials or workmanship").

*Excuse from Performance*
Mills further argues on appeal that the district court erred by failing to find that Double Diamond was excused from performance of the contract. Mills asserts that

absent a finding that Double Diamond was excused from performance, Double Diamond breached the contract by refusing to return to the project and is not entitled to recover. Material breach provides one basis for excusing Double Diamond's performance under the contract. See Restatement (Second) of Contracts § 237 (providing that uncured material breach relieves non-breaching party of obligation to render further performance). Another basis for excusing Double Diamond's performance is the district court's recognition that Mills made Double Diamond's performance under the contract impossible.

The doctrine of impossibility of performance provides an excuse for nonperformance of contractual obligations caused by supervening or existing conditions not contemplated by the parties. 4 Bruner & O'Connor on Construction Law § 14:44 (2002). The Restatement (Second) of Contracts § 261 speaks in terms of impracticability of performance rather than impossibility. South Dakota recognizes the doctrine of commercial impracticability found in § 261 as an excuse from performance "due to extreme and unreasonable difficulty, expense, injury or loss involved." Groseth Int'l, Inc. v. Tenneco, Inc., 410 N.W.2d 159, 167 (S.D. 1987).

The South Dakota Supreme Court has stated that "[a]s a general rule, unexpected difficulty, expense, or hardship involved in performance will not excuse performance where performance has not become objectively impossible." Id. However, it also has recognized that performance may be excused "where very greatly increased difficulty is caused by facts not only unanticipated, but inconsistent with the facts that the parties obviously assumed would likely continue to exist." Id. The question of whether performance has become commercially impracticable generally is considered to be a question of law. Cent. Kansas Credit Union v. Mut. Guar. Corp., 102 F.3d 1097, 1102 (10th Cir. 1996).

The district court found that the number of problems with the materials supplied by Mills made it impossible for Double Diamond to perform. It was

therefore explicit in the district court's findings that it was impracticable for Double Diamond to perform prior to the collapse. However, we believe an analysis of whether it was impracticable for Double Diamond to perform the contract must include the collapse as a factor.

The contract between Mills and Double Diamond called for completion of the project by June 30, 1998. Double Diamond points out that time was of the essence in the contract and that the object of the contract was completion of the arena by a specified date. Double Diamond asserts that the collapse was the result of Mills' failure to provide appropriate materials, and, because of the collapse, it was no longer objectively possible for Double Diamond to complete the project as required under the contract. On this basis, Double Diamond claims it was excused from performance of the contract. We agree.

Double Diamond experienced more than "greatly increased difficulty" in completing the project by the June 30, 1998, contract date by virtue of the collapse. Groseth, 410 N.W. at 167. It was impossible for Double Diamond to complete the project by this date since materials needed for the reconstruction were not scheduled to arrive until July 1, 1998. (See Appellants' App. at 26.) However, commercial impracticability under South Dakota law requires that the difficulty excusing performance be unanticipated and inconsistent with the facts the parties assumed would continue to exist. Id. Both requirements are met here.

The impossibility of completing performance was caused by the collapse, which we view as unanticipated given the assurance by ABC's representative that nothing further needed to be done to protect the structure from collapse. The collapse was also inconsistent with the facts the parties assumed would continue to exist, namely that the structure would remain standing. On these facts, we conclude that Mills' provision of defective materials and the resulting collapse made it commercially impracticable for Double Diamond to complete construction of the

-9-

arena by June 30, 1998, as required by the contract, thereby excusing Double Diamond's performance. Accordingly, Double Diamond did not breach the contract.

*Damages*

Mills argues the district court erred in awarding Double Diamond damages based on the value of its work and consequential damages for losses incurred from the date of the collapse to the end of the contract term. Mills contends that the $49,928 damages award for the value of Double Diamond's work was intended as a recovery based on quantum meruit, while the $33,795 consequential damages award was based on the contract. Mills argues that awarding these separate damages in the same case is contrary to South Dakota law, which requires a party who has been prevented from fulfilling the terms of his contract to either sue on the contract or treat the contract as terminated and obtain the value of his services, but not both. Davis v. Tubbs, 64 N.W. 534, 535-36 (S.D. 1895). Double Diamond argues that both of the district court's damages awards were based on the contract.

As our prior discussion illustrates, the parties tried this case as a breach of contract case. The district court found Mills breached the contract, and we have concluded that implicit in its decision is a finding of material breach. Under South Dakota law, the plaintiff in an action for breach of contract "is entitled to recover all his detriment proximately caused by the breach, not exceeding the amount he would have gained by full performance." Ducheneaux v. Miller, 488 N.W.2d 902, 915 (S.D. 1992) (quoting Regan v. Moyle Petroleum Co., 344 N.W.2d 695, 696 (S.D. 1984)); Davis, 64 N.W. at 536. It is well-settled in this circuit that "the amount of damages in a nonjury case is within the discretion of the trial court and cannot be overturned unless clearly erroneous." Taylor v. Pre-Fab Transit Co., 616 F.2d 374, 375 (8th Cir. 1980).

Double Diamond sought an award of damages for breach of contract, which included progress payments due under the contract at the time of the collapse and

consequential damages for down-time charges. The district court found that the progress payments due at the time of the collapse amounted to $119,928 less the $70,000 Mills previously had paid. Double Diamond was entitled to this amount pursuant to the terms of the contract. See Davis, 64 N.W. at 535 (stating party may sue for breach of contract and recover what he was entitled to under the contract's terms). Although Double Diamond could have sought the entire amount it was entitled to under the contract, see id., it did not seek damages in this amount. Nonetheless, the district court's award of $49,928 in progress payments due under the contract still represents an award based on the contract. Furthermore, we do not believe the district court committed clear error in making this award.

The district court also found that Double Diamond was entitled to consequential damages for "down-time charges" incurred from the date of the collapse through the end of the contract term.[3] The district court found that the down-time charges were proximately caused by Mills' breach of the contract. As a result, the award of consequential damages also represents an award based on the contract.

Mills next contends that the consequential damages award must be reversed because it is not supported by sufficient evidence. Under South Dakota law, it is essential that the party seeking to prove contract damages provide evidence that the damages were caused by the breach. McKie v. Huntley, 620 N.W.2d 599, 603 (S.D. 2000). South Dakota applies "a reasonable certainty test concerning the proof needed to establish a right to recover damages." Id. (quoting Drier v. Perfection, Inc., 259 N.W.2d 496, 506 (S.D. 1977)). All that is required is "a reasonable basis for measuring the loss." Id. at 604. Any doubt as to the certainty of contract damages is to be resolved against the breaching party. Id.

---

[3]Although the district court focused on the period of time between the date of collapse and the end of the contract term, Double Diamond's down-time charges actually began on May 12, 1998, when it had to discontinue work on the project due to the defective nature of the materials. However, Double Diamond apparently did not raise this in the district court.

Due to Mills' provision of inappropriate materials and the resulting collapse, Double Diamond incurred down-time charges for the period it could have been working on the arena. As the district court pointed out, Double Diamond did not have other work scheduled for this period because it was scheduled to work on the arena. As a result, Double Diamond did not have a stream of income to cover its expenses. On these facts, the district court correctly found that the down-time charges were proximately caused by Mills' breach.

Double Diamond's down-time charges were based on the testimony of Wilma Miller. Ms. Miller testified that based on her calculations, Double Diamond incurred $9,000 in wages and payroll costs, $3,000 in office and administration expenses, $906 in insurance costs, and $2,900 in equipment costs as a result of Mills' breach and the subsequent collapse of the building. Her testimony indicates that the amounts of the expenses were based either on the actual payment made or the company's average cost per month. Ms. Miller also testified that Double Diamond had to forego $17,989 in profits as a result of the breach. She testified that this amount was calculated based on a percentage of the work that should have been completed. Based on Ms. Miller's testimony, the district court had a reasonable basis on which to determine the amount of loss Double Diamond incurred. Because that is all that is required under South Dakota law, we conclude that the district court did not clearly err in finding that Double Diamond was entitled to recover $33,795 in consequential damages.

## III. CONCLUSION

For the reasons set forth in this opinion, we AFFIRM the $83,723 judgment in favor of Double Diamond.

_____