# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos.  08-1288/1394

_____

| | | |
|---|---|---|
| American Prairie Construction Co., formerly known as North Central Construction, Inc., | * * * * | |
| Appellee/Cross-Appellant, | * * | Appeals from the United States |
| v. | * * | District Court for the District of South Dakota. |
| John Hoich, | * * | |
| Defendant, | * * | |
| Tri-State Financial, LLC, | * * | |
| Appellant/Cross-Appellee. | * | |

_____

Submitted: September 16, 2009
Filed:  February 16, 2010

_____

Before MURPHY, RILEY, and GRUENDER, Circuit Judges.

_____

RILEY, Circuit Judge.

Tri-State Financial, LLC (TSF) appeals the district court's finding that TSF formed an enforceable settlement agreement with North Central Construction, Inc.

(NCC)[1] on June 21, 2004, during bankruptcy proceedings for Tri-State Ethanol (TSE).[2] NCC cross-appeals, claiming the district court abused its discretion by denying NCC reasonable attorney fees. Because no enforceable contract was formed, we reverse and also dismiss NCC's cross-appeal as moot.

## I. BACKGROUND

### A. Tri-State Ethanol Bankruptcy Proceedings

In 2001, NCC built an ethanol plant in Rosholt, South Dakota. TSE owned the plant, and NCC retained a $1 million equity interest in the plant. The plant began operating in 2002, but was not profitable. TSE failed to pay NCC for construction of the plant, and NCC filed a mechanic's lien and initiated foreclosure proceedings in South Dakota state court. In May 2003, TSE filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of South Dakota, resulting in a stay of NCC's state foreclosure action. In June 2003, a group of investors formed TSF, a shell corporation designed exclusively to provide funding for TSE in an effort to return the ethanol plant to operation.

TSE filed a Modified Chapter 11 Plan in March 2004 (modified plan or plan). NCC and creditor Interstate Electric and Engineering Company (Interstate) objected to their treatment under the plan. On June 14, 2004, TSF representatives engaged in settlement negotiations with NCC representatives. TSF sought an agreement under which TSF could purchase NCC's claims against the bankruptcy estate, thus eliminating NCC's objections to the modified plan. No agreement was reached on that date, but settlement negotiations continued between TSF representative John

---

[1]North Central Construction, Inc. was later renamed American Prairie Construction Co., but has continued to use its former name throughout this litigation.

[2]This appeal was stayed for a period during which we decided the related appeal of Am. Prairie Constr. Co. v. Hoich, 560 F.3d 780 (8th Cir. 2009). Many of the facts and some of the law discussed here are borrowed from our Hoich opinion.

Hoich (Hoich) and NCC representative Peter Rudeen (Rudeen). TSF representatives later authorized Hoich to offer Rudeen $2.5 million in exchange for NCC's claims and interests in TSE. Hoich made the offer on June 20, 2004, the evening before a hearing was scheduled to discuss confirmation of the modified plan.

On the morning of June 21, 2004, shortly before the hearing commenced, Rudeen called Hoich and accepted the offer. Representatives for TSF and Interstate met with NCC attorney Ron Hall (Hall) to discuss how the settlement should be structured. Hoich did not attend either the meeting or the confirmation hearing. Several other TSF representatives attended, including David Ruback (Ruback), TSF's manager; James Jandrain (Jandrain), a certified public accountant; and Jerrold Strasheim (Strasheim), TSF's newly hired attorney. Hall took notes of the discussion and passed the notes around for others to review.

> Shortly after the meeting, the confirmation hearing commenced. Hall read his notes into the record and indicated, with no objection, that his notes represented the settlement agreement among TSF, Interstate, and NCC. Several parties were present, including at least sixteen attorneys, and a significant amount of confusion existed about the terms of the agreement. . . .
>
> The terms of the "settlement agreement" read into the record cannot easily be summarized. TSF agreed to purchase the various claims of NCC and Interstate for $2.5 million, with $475,000 payable to Interstate. The alleged agreement also contained provisions stating NCC and Interstate would not object to TSE's plan confirmation. The reading detailed which claims were being purchased and from which class the claims could be found in TSE's Chapter 11 bankruptcy plan. There was also a provision allowing Interstate to retain one of its claims which was to be paid by TSE's bankruptcy estate over a period of three years.
>
> At the conclusion of the June 21, 2004 hearing, the bankruptcy court requested an amended plan be filed by June 25, 2004, in an effort to expedite the process. The court scheduled a confirmation hearing for

-3-

the amended plan on July 28, 2004. Before the confirmation hearing took place, the parties began to discuss the settlement agreement, and to exchange drafts of proposed documents, in an effort to memorialize the settlement discussed during the June 21, 2004 hearing. Conflicts arose when TSF claimed the agreement was subject to confirmation of the amended plan. NCC vehemently denied the existence of such a condition. In the meantime, TSF raised $2.5 million from investors and deposited the money into a trust account with Strasheim's law firm. . . .

When NCC and TSF failed to agree on the written terms for the formal agreement, NCC filed a motion on July 14, 2004, asking the bankruptcy court to enforce the June 21, 2004 agreement. NCC and Interstate also filed new objections to plan confirmation and ballots rejecting the modified plan in the event TSF failed to perform under the agreement. The motion to approve the settlement agreement and the motion to confirm the modified plan were heard on July 27, 2004.

Shortly before the hearing, NCC attempted to perform its obligations under the "settlement agreement" by tendering to TSF an assignment of its claims against, and its interests in, TSE. TSF . . . declined to accept the tendered assignment and refused to pay NCC. When the hearing convened, TSE and TSF did not pursue confirmation of TSE's modified plan, but instead, joined in a pending motion by the [United States Bankruptcy Trustee (Trustee)] asking the court to dismiss the Chapter 11 proceedings. The bankruptcy court denied the motion to dismiss and instead converted TSE's Chapter 11 reorganization to a Chapter 7 liquidation.

The bankruptcy court also denied NCC's motion to approve the settlement agreement, finding the settlement agreement was not conditional in any manner. The court noted the parties disagreed as to whether a meeting of the minds occurred, but the court concluded it did not have jurisdiction to force TSF, a third party not directly involved in the bankruptcy, to consummate a deal. TSF returned the $2.5 million, which had been placed in a trust account, to the contributors.

Am. Prairie Constr. Co. v. Hoich, 560 F.3d 780, 787-88 (8th Cir. 2009).

-4-

**B.     Present Contract Action**

After the bankruptcy court denied NCC's motion, NCC filed this lawsuit in district court seeking to enforce the alleged settlement agreement against TSF and Hoich. The parties also continued attempts to negotiate a new settlement in the bankruptcy court. The district court repeatedly stayed the contract action to allow negotiations to continue in bankruptcy. During this time, many of TSE's assets were sold, and several secured creditors and priority administrative expenses were paid from the bankruptcy estate.

On June 12, 2006, NCC and the Trustee reached a settlement agreement as to NCC's claim for construction costs. The bankruptcy court granted the Trustee's motion to approve the settlement agreement, but by that time, the district court had lifted the stay in the present action. As a result, the bankruptcy court was unable to enforce the settlement agreement formed by NCC and the Trustee.

On August 1, 2007, this contract action proceeded to trial. The district court issued an opinion and order on December 27, 2007, holding the original settlement agreement, read into the bankruptcy court record on June 21, 2004, was a binding and enforceable agreement. The district court further found both TSF and Hoich were bound by the agreement, and both TSF and Hoich breached the agreement when they failed to perform, making them jointly and severally liable in the amount of $2.5 million, plus prejudgment interest. The award was later reduced to $2,025,000, plus interest, pursuant to a stipulation NCC previously had made. The district court denied NCC's request for attorney fees.

On February 5, 2008, TSF and Hoich filed this consolidated appeal challenging the district court's judgment in favor of NCC. NCC filed a cross-appeal challenging the denial of attorney fees. On November 12, 2008, counsel for TSF, Hoich, and NCC appeared for oral argument before our court. TSF later filed bankruptcy and all proceedings were stayed as to the issues raised by TSF in its appeal and by NCC in

its cross-appeal. The stay did not extend to Hoich's appeal. On March 24, 2009, this court issued an opinion resolving all issues raised by Hoich in his appeal. See Hoich, 560 F.3d at 780. We held, among other things, that the district court erred in finding Hoich had personally guaranteed, or Hoich was a party to, the alleged June 21, 2004 settlement agreement. Id. at 793, 796.

TSF's Trustee filed a motion with the bankruptcy court seeking to lift the stay as to the litigation pending between TSF and NCC. On September 11, 2009, the bankruptcy court granted the motion, and our court was notified the stay was lifted on September 15, 2009. On September 30, 2009, this court severed Hoich's appeal from the remaining consolidated cases. On that same date, we dismissed, as moot, the claims against Hoich in NCC's cross-appeal.

The remaining matters for our court to consider are TSF's claims against NCC in case number 08-1288, and NCC's claim against TSF in case number 08-1394. TSF argues the district court erred when the court (1) denied TSF's motion for recusal and disqualification, (2) denied TSF's motion to dismiss on the basis of issue preclusion, (3) concluded a binding agreement had been formed between TSF and NCC, (4) found the agreement was enforceable, and (5) improperly calculated damages. NCC cross-appeals, contending the district court abused its discretion by denying NCC reasonable attorney fees.

## II. ANALYSIS

### A. Motion for Recusal and Disqualification

Before the district court set a trial date in the present case, the district court heard various appeals arising out of the underlying bankruptcy proceeding. TSF maintains two of the district court's opinions in the bankruptcy appeals demonstrate the court pre-determined whether a binding agreement was formed on June 21, 2004. In one bankruptcy appellate opinion filed on May 17, 2007, the district court stated,

> We know that TSF and [NCC ] . . . reached a settlement in the presence of the bankruptcy judge which was on the record in June of 2004. This was followed by TSF reneging on the settlement by adding terms not previously stated. The bankruptcy judge did not enforce the settlement and allowed TSF to escape from it. Of course, this would be frustrating to any judge.

In another appellate opinion filed January 3, 2007, the district court declared,

> It is obvious from the record that, despite the protestations of the attorneys for TSF, [the bankruptcy judge] believes that . . . TSF twice agreed to settlements, once before [the bankruptcy judge] and then in a mediation session before a United States Magistrate Judge, and then refused to honor them by adding additional stipulations and conditions.

TSF claims the district court's statements in these two appellate opinions demonstrate "the [d]istrict [c]ourt already decided that NCC and TSF reached an agreement and that TSF breached that agreement." TSF asserts, "the [d]istrict [c]ourt already ruled in favor of NCC on the merits before the evidence was presented at trial." Based upon these statements, TSF proposes the district court had an "unfavorable predisposition against TSF" and should have granted TSF's motion to recuse.

"'We review a denial of a motion to recuse for an abuse of discretion.'" <u>Hoich</u>, 560 F.3d at 789 (quoting <u>Trammel v. Simmons First Bank of Searcy</u>, 345 F.3d 611, 612 (8th Cir. 2003)). "Pursuant to 28 U.S.C. § 455(a), '[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.'" <u>Id.</u> "A judge is also required to recuse himself when 'he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.'" <u>Id.</u> (quoting 28 U.S.C. § 455(b)(1)). "'We apply an objective standard of reasonableness in determining whether recusal is required.'" <u>Id.</u> (quoting <u>Fletcher v. Conoco Pipe Line Co.</u>, 323 F.3d 661, 664 (8th Cir. 2003)). "'Under § 455(a), "disqualification is required if a reasonable person who knew the circumstances would question the judge's impartiality, even though no actual bias or prejudice has been shown."'" <u>Id.</u> (quoting <u>Fletcher</u>, 323 F.3d at 664).

"'A judge is presumed to be impartial, and "the party seeking disqualification bears the substantial burden of proving otherwise."'" <u>Id.</u> at 790 (quoting <u>United States v. Denton</u>, 434 F.3d 1104, 1111 (8th Cir. 2006)). "In order to 'establish bias or prejudice from in court conduct,' a party must show 'the judge had a disposition so extreme as to display a clear inability to render a fair judgment.'" <u>Id.</u> (quoting <u>Denton</u>, 434 F.3d at 1111) (internal marks omitted). "'[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" <u>Id.</u> (quoting <u>Denton</u>, 434 F.3d at 1111).

TSF admits the comments made by the district court "were made in a judicial context." TSF does not dispute that the opinions formed by the district judge were based upon facts introduced during, and events occurring in, the course of the related bankruptcy proceeding. As a consequence, in order to establish bias or prejudice from the district court's statements, TSF is required to demonstrate the district court "'judge

had a disposition "so extreme as to display a clear inability to render a fair judgment."'" Id. (quoting Denton, 434 F.3d at 1111). Under the facts of this case, TSF is unable to meet this burden.

In the district court's order denying TSF's recusal motion, the district judge admitted he "erred in stating that settlements had been reached." The district judge continued by resolving, "[settlements] may or may not have been reached and the trial of this action will answer that question." The statements in the district court's opinions and in the transcripts manifestly do not demonstrate a deep-seated favoritism or antagonism, nor do they display a disposition so extreme as to render fair judgment impossible. See Liteky v. United States, 510 U.S. 540, 551 (1994). On the contrary, the district judge admitted his error, and resolved to consider all the evidence presented at trial before deciding whether a contract had been formed. The district court did not abuse its discretion in denying TSF's motion for recusal and disqualification.

### B.  Motion to Dismiss

TSF argues the district court erred in denying TSF's motion to dismiss on the basis of issue preclusion. TSF maintains that on July 27, 2004, at an evidentiary hearing, the bankruptcy court determined that no agreement had been formed at the earlier June 21, 2004 hearing. Therefore, TSF insists the bankruptcy court already resolved the issue, and collateral estoppel should bar further litigation of whether NCC and TSF entered into a binding settlement agreement.

On July 27, 2004, the bankruptcy court held a hearing on NCC's motion to approve a compromise and settlement release. During the hearing, NCC attorney Patrick J. Lee O'Halloran (O'Halloran) stated it was NCC's position an agreement had been reached between TSF and NCC at the June 21, 2004 hearing. O'Halloran continued by proclaiming TSF's refusal to tender the $2.5 million in exchange for NCC's interests in TSE constituted a failure to perform and a breach of the settlement

agreement. The bankruptcy judge answered O'Holloran's complaints, responding, "I don't disagree with you." However, the bankruptcy court declined to enforce the alleged agreement, deciding the court did not have authority to force TSF, a third-party not directly involved in the bankruptcy, to consummate a deal. At no time during the hearing did the bankruptcy court determine whether or not a contract actually existed as of June 21, 2004, between NCC and TSF. TSF's claim relies on a mischaracterization of the record. The district court did not err.

### C.     Settlement Agreement
#### 1.     Formation

On appeal, TSF contends the district court erred in finding a binding agreement was formed during the June 21, 2004 bankruptcy hearing because the alleged agreement failed to include an essential term, plan confirmation, which had been anticipated by the parties. TSF's claim that the settlement agreement was contingent upon confirmation of TSE's modified plan is unsupported by the record. Regardless, TSF is precluded from relying on such a condition precedent because TSF's conduct in joining the Trustee's motion to dismiss instead of pursuing confirmation of the modified plan prevented the alleged condition precedent from occurring. See 17A Am. Jur. 2d Contracts § 687 (2009) ("One who prevents or makes impossible the performance or occurrence of a condition precedent, upon which that person's liability depends under the contract, cannot insist or rely on the condition."); see also Johnson v. Coss, 667 N.W.2d 701, 706 (S.D. 2003) ("'An individual who prevents the occurrence of a condition may be said to be estopped from benefiting from the fact that the condition precedent to his or her obligation failed to occur.'" (quoting 13 Richard A. Lord, Williston on Contracts § 39:7)). Nonetheless, the record makes clear that no agreement was reached for entirely different reasons.

We apply South Dakota law to determine whether a settlement agreement was formed. See, e.g., State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apts., L.C., 572 F.3d 511, 514 (8th Cir. 2009) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78

(1938) for the proposition that federal courts sitting in diversity apply the law of the forum state). "The district court's finding that a settlement offer was made and accepted is a factual one." Enter. Rent-A-Car Co. v. Rent-A-Wreck of Am., Inc., 181 F.3d 906, 909 (8th Cir. 1999) (citation omitted). "We review the district court's factual findings for clear error." Id. (citations omitted). On the other hand, the "[e]xistence of a valid contract is a question of law," subject to de novo review. In re Estate of Neiswender, 616 N.W.2d 83, 86 (S.D. 2000) (citation omitted). We review de novo a district court's interpretation and construction of a contract, as well as a district court's interpretation of state law. See, e.g., Cardinal Health 110, Inc. v. Cyrus Pharm., LLC, 560 F.3d 894, 898 (8th Cir. 2009); Read v. McKennan Hosp., 610 N.W.2d 782, 786 (S.D. 2000).

Under South Dakota law, the elements necessary for formation of a contract are: "(1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and (4) [s]ufficient cause or consideration." S.D. Codified Laws § 53-1-2. "To form a contract, there must be a meeting of the minds or mutual assent on all essential terms." Jacobson v. Gulbransen, 623 N.W.2d 84, 90 (S.D. 2001) (citation omitted). "Consent of the parties to a contract must be: (1) [f]ree; (2) [m]utual; and (3) [c]ommunicated by each to the other." S.D. Codified Laws § 53-3-1. "Consent is not mutual unless the parties all agree upon the same thing in the same sense." S.D. Codified Laws § 53-3-3. "The existence of mutual consent is determined by considering the parties' words and actions." Vander Heide v. Boke Ranch, Inc., 736 N.W.2d 824, 832 (S.D. 2007) (citation omitted).

During the June 21, 2004 bankruptcy hearing, the terms of the "settlement agreement" were read into the record. Hall, an attorney representing NCC, reported an agreement had been reached between the creditors (NCC and Interstate), the debtor (TSE), and two additional parties (TSF and Hoich). Hall further explained his "understanding" Hoich had "personally committed to this deal." When Hall read the terms of the "agreement" into the record, he repeatedly referred to Hoich as a co-

purchaser of NCC's claims. TSF's attorney, Strasheim, also indicated his belief Hoich was "committed" to the agreement. Thus, representatives for both TSF and NCC indicated their belief that Hoich was a party to the contract.

In Hoich, 540 F.3d at 791-96, we held Hoich was never a party to the settlement agreement allegedly formed on June 21, 2004, because Hoich never consented to be bound personally to an agreement with NCC and TSF, and none of the parties present at the June 21, 2004 hearing had the authority to consent on Hoich's behalf. Such consent is a prerequisite to the formation of a contract under South Dakota law. See S.D. Codified Laws § 53-1-2(2).

Because the requisite consent was not provided by one of the necessary parties to the contract, the remaining parties could not have come to a meeting of the minds as to all the essential terms. Cf. S.D. Codified Laws §§ 53-1-2 and 53-3-3; Jacobson, 623 N.W.2d at 90. The statements made by NCC and TSF representatives during the June 21, 2004 hearing demonstrate both NCC and TSF were operating under the mistaken belief that Hoich was a party to the contract. It is hard to imagine a contract term more essential than the identity of the parties. Cf. Chambers v. Roseland, 112 N.W. 148, 149 (S.D. 1907). Because TSF and NCC did not come to a meeting of the minds with respect to this essential term, no contract was ever formed.

### 2. Enforceability
#### a. Bankruptcy Court Approval

Even if TSF and NCC had reached an agreement during TSE's bankruptcy proceedings, such agreement would be unenforceable. It is a recognized principle of bankruptcy law that a bankruptcy court is required to approve any compromise or settlement proposed in the course of a Chapter 11 reorganization before such compromise or settlement can be deemed effective. See, e.g., Fed. R. Bank. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."); Protective Comm. for Indep. Stockholders of

TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424 (1968) (citation omitted) ("The fact that courts do not ordinarily scrutinize the merits of compromises involved in suits between individual litigants cannot affect the duty of a bankruptcy court to determine that a proposed compromise forming part of a reorganization plan is fair and equitable."); Reynolds v. Comm'r of Internal Revenue, 861 F.2d 469, 473 (6th Cir. 1988) (citation omitted) ("In bankruptcy proceedings, as distinguished from ordinary civil cases, any compromise between the debtor and his creditors must be approved by the court as fair and equitable."). That is, a settlement or compromise in bankruptcy is not enforceable in advance of bankruptcy court approval. See, e.g., Levey v. Sys. Div., Inc., (In re Teknek, LLC), 563 F.3d 639, 651 (7th Cir. 2009) (recognizing a settlement agreement was null and void when the bankruptcy court lacked jurisdiction to approve the agreement, "because the trustee is required to get the bankruptcy court's approval before settling claims"); In re Tarrant, 349 B.R. 870, 893 (Bankr. N.D. Ala. 2006); In re Degenaars, 261 B.R. 316, 319 (Bankr. M.D. Fla. 2001).

Likewise, a settlement agreement made in bankruptcy has no effect when the parties to the agreement fail to comply with Fed. R. Bank. P. 9019, which requires notice to creditors and court approval.[3] See, e.g., Travelers Ins. Co. v. Am. AgCredit Corp. (In re Blehm Land & Cattle Co.), 859 F.2d 137, 141 (10th Cir. 1988); Wheeling Structural Steel Co. v. Moss, 62 F.2d 37, 39-40 (4th Cir. 1932); Billingham v. Wynn & Wynn, P.C. (In re Rothwell), 159 B.R. 374, 379 (Bankr. D. Mass. 1993) (finding a settlement agreement unenforceable with no effect where the parties failed to comply with Rule 9019); In re Masters, Inc., 149 B.R. at 292; Bramham v. Nev. First Thrift (In re Bramham), 38 B.R. 459, 465 (Bankr. D. Nev. 1984) (citation omitted)

_____

[3]We do not address the issue of whether a party to a settlement agreement may unilaterally repudiate the agreement after approval has been sought under Rule 9019, but before the bankruptcy court has had the opportunity to approve the settlement. See, e.g., Musselman v. Stanonik (In re Seminole Walls & Ceilings Corp.), 388 B.R. 386, 392-96 (M.D. Fla. 2008).

("Absent compliance with the[] requirements of notice, hearing, and court approval, a purported settlement or compromise is unenforceable.").

In this case, no effective agreement was achieved because the bankruptcy court declined to approve the settlement proposed by the parties. At the hearing on July 27, 2004, on NCC's motion to approve the settlement agreement, the bankruptcy court noted the parties disagreed as to whether a meeting of the minds occurred on June 21, 2004. The bankruptcy court then denied approval of the settlement agreement, finding the court did not have jurisdiction to force TSF, a third party not directly involved in the bankruptcy, to consummate a deal.

NCC did not appeal the bankruptcy court's decision—a decision which would have been reviewed for an abuse of discretion. See New Concept Hous., Inc. v. Poindexter (In re New Concept Housing, Inc.), 951 F.2d 932, 939 (8th Cir. 1991) (citation omitted) ("A bankruptcy court's approval [or denial] of a settlement will not be set aside unless there is plain error or abuse of discretion."). Instead, NCC filed an independent lawsuit in district court, attempting to enforce the terms of the settlement agreement. NCC effectively attempted to circumvent the requirement of bankruptcy court approval. "A bankruptcy court is ordinarily in the best position, as the trial court and as the ongoing supervisory court for the bankruptcy proceeding, to determine whether a compromise is in the best interest of the estate and 'fair and equitable.'" Sandoz v. Bennett (In re Emerald Oil Co.), 807 F.2d 1234, 1239 (5th Cir. 1987) (quoting Anderson, 390 U.S. at 424). We are not in such a favored position here to decide the best interests of the estate or any of the other parties.

The agreement at issue here involved a debtor in bankruptcy and two creditors. The alleged agreement impacted various aspects of the bankruptcy, as it involved TSF purchasing NCC's and Interstate's claims against the estate, and the agreement discussed various classes from which the claims would be purchased. Under the circumstances presented here, the district court could not enforce an independent

-14-

agreement, because the agreement was not independent—it was inherently intertwined with the bankruptcy proceeding. Quite simply, a settlement reached between a debtor in bankruptcy and a creditor is not effective under Fed. R. Bank. P. 9019 absent bankruptcy court approval. See, e.g., In re Cincinnati Microwave, Inc., 210 B.R. 130, 133 (Bankr. S.D. Ohio 1997). The district court erred in treating the alleged settlement agreement as independent from the bankruptcy, and in holding the agreement was an enforceable, binding contract.

### b.  Frustration of Purpose and Commercial Impracticability

Even if bankruptcy court approval were not required for settlement agreements made between debtors in bankruptcy and their creditors, this purported agreement would still be unenforceable. At the time the agreement was made, TSE was a debtor-in-possession involved in a Chapter 11 reorganization, and the terms of the proposed agreement directly reflected the state of affairs in the bankruptcy proceeding. Under the terms of the agreement, TSF was to purchase NCC's and Interstate's creditor claims against TSE, and in exchange, NCC and Interstate would remove their objections to confirmation of TSE's modified bankruptcy plan so confirmation could proceed.

The terms of the agreement provided: (1) TSF would purchase NCC's claim in class 12 and NCC's equity interest in class 18 of TSE's modified plan; (2) TSF would purchase a portion of Interstate's class 13 claim, and TSF would ensure Interstate received the balance of Interstate's claim over a three-year period at 9% interest; (3) the total purchase price to be divided among NCC and Interstate would be $2.5 million, and of that amount, $475,000 was to be allocated to Interstate's class 13 claim; (4) after the purchase and transfer of NCC's and Interstate's claims, NCC and Interstate would withdraw all objections to confirmation of TSE's modified plan; and (5) the settlement would be a final settlement of all of NCC's and Interstate's claims and NCC's state court foreclosure action would be dismissed with prejudice.

After NCC filed suit in the district court seeking enforcement of the agreement, NCC and TSF agreed to stay litigation on the contract dispute so settlement negotiations could continue in the bankruptcy court. In the meantime, the bankruptcy case was converted from a Chapter 11 reorganization to a Chapter 7 liquidation. The estate's primary asset, the ethanol plant, was sold, and substantial interim distributions were made to various creditors and administrative expense claimants. Both NCC and TSF were well aware the administration of the bankruptcy case was continuing while the contract dispute was litigated. Yet, neither party sought a delay or alteration in the administration of the bankruptcy case during that time. During that same time, NCC successfully negotiated a settlement agreement with the Trustee. However, the bankruptcy court could not enforce the new settlement because the bankruptcy proceeding was stayed due to the contract litigation in the district court.

Under the facts of this case, with such a drastic change in circumstances from the time of the original agreement to the time the district court attempted to enforce the agreement, the purpose of the agreement had been frustrated and was no longer enforceable. "Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary." Restatement (Second) of Contracts § 265 (1981). See also Groseth Int'l., Inc., v. Tenneco, Inc., 410 N.W.2d 159, 165-68 (S.D. 1987) (providing a detailed discussion of the doctrines of commercial frustration and commercial impracticability). Likewise, "there may be excuse from performance where very greatly increased difficulty is caused by facts not only unanticipated, but inconsistent with the facts that the parties very obviously assumed would likely continue to exist." Id. at 167 (citations omitted). "The most important question is whether an unanticipated circumstance has made performance of the promise vitally different from what the parties contemplated when they entered the contract." Id. (citation omitted).

The facts that exist today are inconsistent with the facts the parties "obviously assumed would likely continue to exist" at the time the purported settlement was made. Id. This is clear from the context of the agreement. The proposed agreement was made during bankruptcy proceedings for TSE. TSF was created for the sole purpose of providing funding to TSE in an effort to return the ethanol plant to operation. When TSF negotiated with NCC, TSF's primary purpose in agreeing to purchase NCC's claims against TSE's bankruptcy estate was to remove NCC's objections to confirmation of TSE's modified plan. Once those objections were removed, TSE would have been more likely to obtain bankruptcy court approval of its modified plan and succeed in reorganization. The parties later disagreed as to whether a meeting of the minds had occurred, TSF refused to perform, and NCC refused to remove its objections to TSE's modified plan. The bankruptcy court's conversion of the bankruptcy estate to a Chapter 7 liquidation was not contemplated by the parties, and because the ethanol plant then would necessarily be sold, the conversion defeated TSF's entire purpose in negotiating with NCC.

Neither TSF nor NCC contemplated the liquidation of the bankruptcy estate. When NCC read the terms of the purported agreement on the record, NCC stated TSF would purchase NCC's class 12 claim and class 18 equity interest in TSE's estate. TSF can no longer purchase those class claims because, after the conversion, such classes ceased to exist. Similarly, TSF cannot purchase Interstate's class 13 claim as contemplated because that class claim also does not exist. Further, NCC and Interstate agreed to remove all objections to the modified bankruptcy plan after TSF purchased NCC's and Interstate's claims against TSE's estate. NCC and Interstate can no longer carry out their end of the bargain because no plan exists today, partially as a consequence of NCC's and Interstate's continued objections to the plan.

The circumstances in the bankruptcy case changed dramatically from the time the proposed agreement was read into the record at the June 21, 2004 hearing to the time the district court attempted to enforce the agreement on December 27, 2007. The

agreement is no longer enforceable in its original form. The district court erred in finding the agreement was enforceable.[4]

## III.   CONCLUSION

We affirm the district court's denial of TSF's motion for recusal and disqualification and TSF's motion to dismiss. We reverse the district court's judgment finding a binding, enforceable contract was established between TSF and NCC on June 21, 2004.

_____

_____

[4]We need not discuss TSF's final issue on appeal, that the district court erred in its calculation of damages, because under our holding, NCC is not entitled to damages on the breach of contract theory. We issue no opinion as to whether NCC has other claims against TSF which were not addressed in this appeal. The claim presented by NCC in its cross-appeal, that the district court abused its discretion in denying NCC reasonable attorney fees, is now moot. See, e.g., Sunder v. U.S. Bancorp Pension Plan, 586 F.3d 593, 603 (8th Cir. 2009) (declining to address a moot issue in a cross-appeal).