**In re John P. MCKAY, Jr., Debtor.**

**Hyundai Motor Finance Company, Plaintiff**

v.

**John P. McKay, Jr., Defendant.**

**Bankruptcy No. 4:08–bk–16664 E.**

**Adversary No. 4:09–ap–01092.**

United States Bankruptcy Court, E.D. Arkansas, Little Rock Division.

Dec. 15, 2010.

Charles T. Coleman, Wright, Lindsey & Jennings LLP, Little Rock, AR, for Plaintiff.

John Paul McKay, Jr., Little Rock, AR, pro se.

### ORDER GRANTING MOTION TO ENFORCE SETTLEMENT

AUDREY R. EVANS, Bankruptcy Judge.

On October 19, 2010, the Court heard the Plaintiff's *Motion to Enforce Settlement* ("**Motion to Enforce**"). The Debtor appeared *pro se*, and Charles ("Charlie") Coleman appeared on behalf of the Plaintiff, Hyundai Motor Finance Company ("**Hyundai**"). Robert L. Skip Henry appeared on behalf of James ("Jim") Smith, Jr., who was also present. This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

### PROCEDURAL BACKGROUND

Hyundai filed its Complaint on April 28, 2009, and Defendant answered on May 22, 2009. The matter was ultimately scheduled for trial in January 2010, but prior to the trial date, the parties' attorneys informed the Court that the matter had settled and canceled the trial. Hyundai

filed its Motion to Enforce on June 14, 2010, and the motion was scheduled for hearing for August 3, 2010. On July 28, 2010, the Debtor's attorney of record, Mr. Smith filed a motion seeking to withdraw as Debtor's counsel citing "material and apparently irreconcilable differences" between Debtor and counsel. Mr. Smith sought a continuance of the August 3, 2010 hearing to allow Debtor time to find new counsel. Mr. Smith's motion was granted on July 30, 2010; he was relieved as counsel, and the hearing on Hyundai's Motion to Enforce was then scheduled for September 14, 2010. On September 13, 2010, Hyundai moved to continue the hearing until the next month due to a scheduling conflict on the part of Hyundai's counsel. Hyundai's counsel also noted that the Debtor did not yet have an attorney of record, and Hyundai's counsel could not reach the Debtor. Hyundai's motion was granted, and the hearing was rescheduled for October 19, 2010. The Court also heard and denied the Debtor's *Motion for Continuance* on October 19, 2010, and entered an Order to that effect on October 20, 2010 (docket # 42).

## FACTS

Debtor filed bankruptcy under Chapter 7 on October 28, 2008. On April 28, 2009,[1] Hyundai filed its Complaint requesting a determination that the debt owed it by Debtor is excepted from the Debtor's discharge under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), to the extent of $545,000 and $73,934.21. The factual basis for Hyundai's Complaint does not warrant a detailed description in this Order because the issue presented is solely whether the Debtor and Hyundai have entered into a binding settlement agreement. However, for purposes of background, a brief summary is provided here.

### The Complaint

The debt owed by Debtor to Hyundai arose out of an inventory loan and security agreement and an addendum (the "**Contract**") between Hyundai and McKay Motors I, LLC ("**McKay Motors**"), a business entity in which Debtor was the sole member and chief executive officer. In the Contract, Hyundai agreed to finance McKay Motors in its purchase of inventory for its automobile dealership in exchange for McKay Motor's promise to make certain interest payments to Hyundai and to repay the amount advanced by Hyundai on each item of vehicle inventory purchased under the terms of the Contract. Debtor personally guaranteed the obligations of McKay Motors to Hyundai. Hyundai was also granted a security interest in certain property described in the Contract. Under the Contract, McKay Motors was required to pay Hyundai the sale proceeds of financed vehicles by a certain time, and if payment was not made by that time, the vehicles were deemed to be "sold out of trust" or "SOT." Hyundai alleges that Debtor as CEO of McKay Motors sold financed vehicles out of trust, and used sale proceeds to pay other liabilities besides the debt owed to Hyundai. Hyundai also alleges Debtor was untruthful in certain representations made in a loan application executed by Debtor in connection with the refinancing of McKay Motors' real estate loan. Hyundai further alleges that as McKay Motors' retail customers traded in vehicles, McKay and McKay Motors were supposed to pay off those vehicles but did not. As a result, when Hyundai later received a total of $73,934.21, Hyundai (with McKay and McKay Motors'

---

**1.** Hyundai's complaint was timely filed since it timely moved for extensions of time in which to file a complaint objecting to discharge or seeking to determine dischargeability. *See* Federal Rule of Bankruptcy Procedure 4007.

consent) did not apply that to McKay Motors or McKay's outstanding debt but applied it to the lien payoff balances on the traded-in vehicles. Hyundai alleges this is a further extension of credit to McKay and McKay Motors.

Hyundai sued McKay and McKay Motors for default under the Contract and guaranty in the United States District Court for the Eastern District of Arkansas (the "**District Court**") on December 20, 2006. On June 5, 2008, the District Court entered a judgment against Debtor in favor of Hyundai in the amount of $276,000 (the "**Judgment**"). On October 8, 2008, the District Court entered an additional judgment against Debtor in favor of Hyundai for attorneys fees in the amount of $260,390.29 (the "**Supplemental Judgment**").

In its Complaint filed in this Court on April 29, 2009, Hyundai seeks a determination that the debt owed it by Debtor is excepted from the Debtor's discharge under 11 U.S.C. § 523(a)(2)(A), (a)(4) and (a)(6), to the extent of $545,000 (based on the Judgment and Supplemental Judgment) and $73,934.21 (the amount paid by Hyundai to pay off existing loans on retail customers' trade-in vehicles). Mr. Smith filed an Answer on behalf of McKay on May 22, 2009.

### Settlement Negotiations

This adversary proceeding was initially set for trial for September 10, 2009, and on motion of the Debtor, it was continued until December 2, 2009. After a November 19, 2009 pretrial conference was held in the Court's chambers for the purpose of determining how much time would be needed to present testimony at the Trial, an order was entered on November 20, 2009, moving the trial to January 20–21, 2010.

It is undisputed that the parties engaged in settlement negotiations prior to the January 2010 trial date. Mr. Smith testified that the Debtor gave him authority to engage in these settlement negotiations. Mr. Smith testified that the parties reached a settlement which was memorialized in a series of emails in which the essential terms of the settlement were set forth. He further testified that he was authorized by the Debtor to represent to Mr. Coleman that the matter was settled on the terms set forth in the emails. Those emails were introduced as part of Plaintiff's Exhibit 2 which was comprised of the Plaintiff's Motion to Compel and the exhibits attached to it. Specifically, on January 15, 2010, at 12:11 a.m., Charlie Coleman wrote an email to Jim Smith and Eric Weavers, one of the Debtor's other attorneys who represented him during the Federal District Court lawsuit as well as during the settlement negotiations,[2] stating the following:

Gentleman:

Below is the outline of the settlement terms I laid out to Jim on Wednesday, while I was driving back from NW Arkansas. Let me know where we stand,

---

2. Mr. Smith testified that Mr. Weavers also represented the Debtor during the settlement negotiations. The Debtor initially testified that Mr. Weavers was not authorized to represent him during the bankruptcy or the adversary proceeding but later testified that he did ask Mr. Weavers as well as Mr. Jack Pruniski to assist him with the settlement negotiations because he began to not rely on Mr. Smith. The Debtor also testified that he discussed with these attorneys whether or not he could enter into the settlement agreement based on the questions he had about his life insurance policy. Based on this testimony in addition to the inclusion of these attorneys on all the emails discussing the settlement, the Court finds that Debtor authorized Mr. Weavers and Mr. Pruniski to assist him with the settlement of this adversary proceeding.

so I can stop reading and marking the transcript.

——A Non-dischargeable $150,000 consent judgment entered against McKay.

——In the event McKay pays the Settlement Amount, then Mr. McKay will have no further personal liability on the judgment.

——The Settlement Amount will be $60,000, paid in 3 annual installments of $20,000 each, beginning on September, 2012.

——[Hyundai] or its assignee will hold ownership and beneficiary status of the $1MM Life Insurance Policy previously offered by McKay.

* [Hyundai] will not be required to make premium payments on the policy, but in the event a decision is made by [Hyundai] to not make premium payments, notice will be provided to McKay. [Hyundai] will incur no liability to any person or party, including McKay in the event it fails to provide notice to McKay that the premiums will not be paid.

* In the event of Mr. McKay's death and the policy remains in effect, [Hyundai] shall be a primary beneficiary under the policy to the extent of the full amount of the judgment, including the award of attorney fees, plus the amount of any insurance premiums actually paid by [Hyundai] on the policy. Any policy proceeds in excess of the amount paid to [Hyundai] will be paid pursuant to McKay's secondary beneficiary designation.

Thanks and let me know.

Jim Smith responded at 3:44 p.m. January 15, 2010, with copies to Eric Weavers and another email address, as follows:

Charlie

This is to confirm that we have agreed to settle this matter pursuant to the terms and conditions we discussed. The only matter we talked about that is not addressed in some detail is the reversion of the policy interests to John upon either non payment of premiums by Hyundai or upon payment of the settlement amount. I understand that we will address this I[sic] the written agreement presented to the court for approval after the required notice to creditors. Thanks.

Mr. Coleman responded at 3:56 p.m. the same day, as follows:

Jim:

you are correct that upon non-payment of the premiums by [Hyundai] the policy will revert to Mr. McKay. However, as long as [Hyundai] pays the premiums, [Hyundai] will have the right to retain its beneficiary status under the policy to the extent of the sum of the full amount of the portion of the Settlement Amount actually paid, if any. The balance of the insurance proceeds would be paid to Mr. McKay's designated beneficiary, notwithstanding the fact that [Hyundai] had been paying the premiums for him.

Mr. Smith responded to Mr. Coleman at 4:09 p.m. the same day stating, "You're correct."

Mr. Smith testified that he and Mr. Coleman then contacted the Court and canceled the January trial date. On January 20, 2010, docket entry # 20 was added stating: "Hearing Scheduled for 1/20/10 Not Held. PER PARTIES MATTER SETTLED ...".[3] He also testified the attorneys began drafting and exchanging

---

**3.** The Court takes judicial notice of the docket and all documents filed in the current case. *See* Fed.R.Evid. 201; *In re Henderson,* 197 B.R. 147, 156 (Bankr.N.D.Ala.1996) ("The court may take judicial notice of its own orders and of records in a case before the court, and of documents filed in another court.") (citations omitted); *see also In re Penny,* 243 B.R. 720, 723 n. 2 (Bankr.W.D.Ark.2000).

drafts of a settlement agreement and a motion to approve the settlement to be filed in the case. A copy of a draft settlement agreement and a *Joint Motion for Approval of Compromise* were also attached to Plaintiff's Exhibit 2 as Exhibit 3 to Plaintiff's Motion to Compel.

On March 22, 2010, Jack Pruniski, another of Debtor's lawyers assisting him with the settlement, emailed a copy of a revised settlement agreement to Jim Smith with a copy to Debtor, with the following note:

> Jim, attached is the settlement agreement with some proposed changes. The insurance policy is currently on a monthly bank draft. Hyundai will need to make arrangements to have an account drafted or pay quarterly. Also, do you know if "Jr." is part of the title of John's trust? Please let me know if you have any questions or comments regarding the proposed changes to the agreement.

The March 22, 2010 email was forwarded by Mr. Smith to Mr. Coleman on March 24, 2010, with a note asking Mr. Coleman to read and call Mr. Smith. A copy of the draft Settlement Agreement with Mr. Pruniski's revisions noted in the margin was submitted into evidence along with these emails as part of Plaintiff's Exhibit 2, specifically as Exhibit 3 to Plaintiff's Motion to Compel.

On April 14, 2010, Mr. Coleman emailed Mr. Smith another draft of the Settlement Agreement. The email stated, "The agreement looks okay. I marked up some additional spacing and one insertion in Para. 3. Nothing substantive. If you tell me it is okay with your client, and get me

a clean execution copy, we can proceed to get the agreement signed." This email and revised settlement agreement were also included in Plaintiff's Exhibit 2 as Exhibit 5 to Plaintiff's Motion to Compel. In his own testimony, the Debtor pointed out that Mr. Coleman had not submitted a reply to this email from Mr. Smith affirming the settlement.

The Debtor testified that he never authorized Mr. Smith to settle this matter on his behalf.[4] He said that since settlement negotiations began, there had been confusion about the life insurance he was being asked to sign over. The Debtor maintains that he could not have agreed to the settlement with Hyundai because he did not know which policy it wanted until the week before the Hearing in this matter; and that he was never sure he even had the right to assign one of those insurance policies since they are owned by the John P. McKay, Jr. Irrevocable Trust. Debtor also explained that he was concerned that if Hyundai failed to pay premiums on his life insurance policy, it would lapse, and he would not be able to get or afford more life insurance at his age (he testified he was 68 in January 2010).

Debtor testified that during January 2010, and specifically after January 15, 2010, he was made aware that two of his life insurance policies were identical (although he did not clarify how they were identical). He also said that one of these policies had been assigned to OneBanc in 2005 for some obligations that he owed. Debtor also explained that in January 2010, a direct draft deposit was not made

---

4. The Debtor objected to Mr. Smith's testimony on the basis of attorney-client privilege. The Court overruled the Debtor's objection finding that the Debtor necessarily waived the attorney-client privilege by putting in issue Mr. Smith's authority to settle the case on his behalf and the Debtor's agreement to that settlement. *See Toney v. Raines,* 224 Ark. 692, 698, 275 S.W.2d 771, 775 (Ark.1955) ("[A]n owner of the privilege cannot, after testifying concerning such confidential communications himself without objection, invoke the privilege to prevent other parties to the communications from testifying to them.").

into his bank account from which the premiums on this particular policy were drawn, the premium payment was not made, and the policy went into default. He explained that he learned this in February 2010, and he and Mr. Smith met with David Duke, attorney for OneBanc, and tried to work out the default on this policy before they made a decision on settlement with Hyundai. The Debtor testified that until he recently received two letters post-marked October 9, 2010, and October 11, 2010, clarifying how premium payments were to be made on the two policies and which one was assigned to OneBanc, he did not know details about these policies such as how payments were made and which one was assigned to OneBanc. These letters, admitted into evidence as Defendant's Exhibits 1 and 2, showed that both policy numbers 0009166490 and 0009175510 were held by The State Life Insurance Company, a ONEAMERICA® Company ("**State Life**"); that the Debtor was the insured party; that the owner of the policies is the John P. McKay, Jr. Irrevocable Trust (the "**Trust**"), and that the required premium payments were $521.18. The letters appear to be in response to the Debtor's request that the premiums be deducted from a new bank. The Court cannot ascertain which policy had been assigned to OneBanc based on these letters, but the Debtor testified that the assignment to OneBanc had been forfeited as part of his settlement with OneBanc prior to his bankruptcy. (There was no additional information provided about this settlement with OneBanc). Debtor testified he also had a John Hancock life insurance policy which had a quarterly premium draft and that he had discussed that policy with Mr. Smith. After discussions between Mr. Coleman and Mr. Smith regarding settlement, the Debtor learned that Mr. Coleman intended one of the State Life policies to be assigned as part of

the settlement with Hyundai. Debtor stated that he cooperated fully by putting Mr. Coleman in touch with the insurance agent to get information on the policies. Although earlier in his testimony, Debtor stated these discussions occurred as part of the settlement negotiations for this case, Debtor also stated that Mr. Coleman obtained all of the information about his insurance policies during the Federal trial, and that Mr. Coleman probably understood better than he did that the Debtor could not assign the policies held by the Trust.

Despite Debtor's testimony that he did not know which insurance policy was to be included as part of the settlement, each draft of the settlement agreement introduced into evidence included the following description in paragraph 7: "the insurance policy identifying John P. McKay, Jr. as the named insured, issued by The State Life Insurance Company, policy number 0009166490, dated March 5, 1999, in the face amount of $1,000,000." The Debtor introduced an opinion letter dated October 18, 2010, prepared by Mr. Trav Baxter of the Mitchell Williams law firm regarding this trust as Defendant's Exhibit 3. This letter states that the Debtor is not the trustee of the Trust or a beneficiary of the Trust and therefore has "no power to transfer, assign or pledge the assets of the Trust." The letter goes on to state, "Furthermore, since you are not a beneficiary of the Trust (i.e. you are not entitled to receive any income or principal distributions from the Trust) and you have retained no power over the assets of the Trust, none of your creditors or assignees may reach the assets of the Trust." Debtor maintains that Mr. Coleman and Mr. Smith knew about this restriction, and that the Debtor could not have agreed to a settlement that included insurance that was held by the Trust. (Debtor states

that he did not know about the restriction, that the attorneys knew about the restriction, and that this somehow prevented him from agreeing to the assignment of the life insurance policy even though he allegedly did not know which policy was to be assigned as part of the settlement.)

## DISCUSSION

■ In determining whether an enforceable settlement agreement has been reached, the Bankruptcy Court applies Arkansas law. *American Prairie Construction Co. v. Hoich*, 594 F.3d 1015, 1023 (8th Cir.2010) ("We apply [State] law to determine whether a settlement agreement was formed.") (citing *State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apts., L.C.*, 572 F.3d 511, 514 (8th Cir.2009)). Accordingly, the Court first analyzes whether an enforceable settlement contract was created under Arkansas law, and then turns to the question of whether bankruptcy court approval pursuant to Federal Rule of Bankruptcy Procedure 9019(a) is required before such a settlement may be enforced.[5]

### Was a Settlement Reached Under Arkansas Law?

■ The legal standard for determining whether a matter has been settled under Arkansas law was summarized by the Arkansas Supreme Court as follows:

Courts will enforce contracts of settlement if they are not in contravention of law. *McCoy Farms, Inc. v. J & M McKee*, 263 Ark. 20, 563 S.W.2d 409 (1978), *reh'g denied*, April 17, 1978. The essential elements of a contract include (1) competent parties, (2) subject matter, (3) legal consideration, (4) mutual agreement, and (5) mutual obligations. *Ward v. Williams*, 354 Ark. 168, 118 S.W.3d

513 (2003). We keep in mind two legal principles when deciding whether a valid contract was entered into: (1) a court cannot make a contract for the parties but can only construe and enforce the contract that they have made; and if there is no meeting of the minds, there is no contract; and (2) it is well settled that in order to make a contract there must be a meeting of the minds as to all terms, using objective indicators. *Alltel Corp. v. Sumner*, 360 Ark. 573, 203 S.W.3d 77 (2005). Both parties must manifest assent to the particular terms of the contract. *Id.* Moreover, the terms of a contract cannot be so vague as to be unenforceable. *City of Dardanelle v. City of Russellville*, 372 Ark. 486, 277 S.W.3d 562 (2008). The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. *Id.*

*DaimlerChrysler Corp. v. Smelser*, 375 Ark. 216, 218–219, 289 S.W.3d 466, 470 (2008) (Imber, J.). "[L]ike any other contract, the terms of a settlement agreement must be definitely agreed upon and reasonably certain.... A mutual agreement, as evidenced by objective indicators, is essential." *Roberts v. Green Bay Packaging, Inc.*, 101 Ark.App. 160, 163, 272 S.W.3d 125, 128 (Ark.App.2008) (citing *Key v. Coryell*, 86 Ark.App. 334, 341, 185 S.W.3d 98, 103 (2004); *Ward v. Williams*, 354 Ark. 168, 180, 118 S.W.3d 513, 520 (2003)) (Marshall, J.). *See also Carder Buick–Olds Co., Inc. v. Wilson*, 1994 WL 693223, \*1 ("The law favors amicable settlement of controversies, and settlement agreements, being contractual in nature, are binding if they possess the essential elements of any other contract; the ques-

---

**5.** All references to rules in this order refer to the Federal Rules of Bankruptcy Procedure unless otherwise indicated.

tion of whether a settlement has been reached is one of fact.") (citing *Williams v. Davis,* 9 Ark.App. 323, 659 S.W.2d 514 (1983)).

 In this case, the only disputed contract element is whether there was mutual agreement, *i.e.,* a meeting of the minds. Specifically, the Debtor claims there could be no meeting of the minds because he did not authorize his attorney to settle the case on his behalf upon the terms discussed between Mr. Smith and Mr. Coleman. In Arkansas, "[t]he law is well settled that an attorney employed to conduct litigation involving property has no implied or apparent authority, solely by reason of his or her employment, to bind the client in regard to the subject matter of the litigation, except with respect to matters of procedure." *Dewitt v. Johnson,* 349 Ark. 294, 298, 77 S.W.3d 530, 532 (2002) (citing *McCombs v. McCombs,* 227 Ark. 1, 295 S.W.2d 774 (1956); *Cullin–McCurdy Constr. Co. v. Vulcan Iron Works,* 93 Ark. 342, 124 S.W. 1023 (1910)). Mr. Smith does not rely on apparent or implied authority but testified that he was specifically authorized to enter into settlement negotiations with Hyundai and to settle the case based on the terms the parties ultimately agreed upon. The Court believes Mr. Smith and does not find the Debtor's testimony credible. The Debtor's testimony was contradictory on several points, and moreover, the course of action between Mr. Smith, Mr. Coleman, and Debtor's other attorneys prove that the Debtor authorized the settlement, and that all parties believed the case was settled and worked towards implementing that settlement, as described herein.

The essential terms of the settlement are evidenced by the emails and draft settlement agreements submitted by Hyundai as well as the testimony of Mr. Smith. Specifically, the terms of the agreement were laid out in Mr. Coleman's email to Mr. Smith dated January 15, 2010. The Debtor agreed to a $150,000 consent judgment in favor of Hyundai with a settlement amount of $60,000 to be paid in three annual installments of $20,000 each beginning September 2012. Debtor also agreed to transfer ownership and beneficiary status of a $1 million life insurance policy to Hyundai; specific details about the premium payments on this policy were laid out in the emails between Mr. Coleman and Mr. Smith. Significantly, Mr. Smith responded to Mr. Coleman's initial email the same day, stating: "This is to confirm that we have agreed to settle this matter pursuant to the terms and conditions we discussed." The only issue left unresolved according to Mr. Smith's response was the potential reversion of the life insurance policy in the event Hyundai failed to make premium payments or upon the Debtor's full payment of the settlement amount. Mr. Coleman and Mr. Smith then agreed about how the policy would revert to Debtor in subsequent emails the same day, with Mr. Smith responding to Mr. Coleman's description of the reversion terms with: "You're correct."

Of utmost significance is the attorney's actions following these emails. They called the Court together and canceled the trial date. They began exchanging drafts of settlement agreements, and they drafted a motion for court approval of the settlement. When contacted by Court staff for an order settling the case, Mr. Smith responded to Court staff that they were working on the assignments needed to implement the settlement.

It is also significant that Debtor had two other attorneys reviewing these emails and draft settlement agreements, and making comments on them. Debtor testified he received a substantial bill ($2,500–$3,000) from one of his attorneys for such work.

Further, Debtor initially testified that these attorneys were not authorized to help with the settlement of the bankruptcy adversary proceeding but then testified that he consulted with them because he began to have reservations about his representation by Mr. Smith. Despite any such reservations, however, it was Mr. Smith who went with Debtor to meet with OneBanc's attorney in February 2010 (after the settlement had already been reached) to clear up the premium draft problems with one of his insurance policies. It is clear that Debtor not only authorized Mr. Smith to enter into settlement negotiations on his behalf, but he authorized two other attorneys to do so as well. In fact, Mr. Pruniski even made minor nonsubstantive revisions to the settlement agreement. If the Debtor did not in fact agree to this settlement, he would have communicated this to at least one of his three attorneys who would have then stopped the settlement process. Instead, the evidence shows that the parties uniformly worked towards implementation of the settlement as evidenced in the email exchanges and the three settlement agreement drafts submitted into evidence, but that Debtor ultimately had second thoughts and regretted his decision to settle this case on the agreed upon terms.

■■■ The evidence shows that after Debtor agreed to the settlement but failed to follow through with its execution, he began to create an impossibility defense to shore up his very weak "no authority" defense. Debtor claims he could not have agreed to one term included in the settlement—the assignment of the $1 million life insurance policy to Hyundai. Specifically, Debtor claims there was confusion about which life insurance policy was to be assigned to Hyundai, and that he only learned which policy Hyundai wanted a few weeks before the hearing in this mat-

ter. The Debtor also contends he could not have promised to assign the life insurance policy because he did not have the power to do so since it was owned by an irrevocable trust, of which he is not the trustee or a beneficiary. The evidence does not support either contention. First, the parties all knew which policy they were speaking of because it was named and identified by the policy number in each of the settlement agreement drafts. Paragraph 7 of each settlement agreement draft identifies the policy as "the insurance policy identifying John P. McKay, Jr. as the named insured, issued by The State Life Insurance Company, policy number 0009166490, dated March 5, 1999, in the face amount of $1,000,000."

■■■ Second, all the parties were aware of the fact that the life insurance policy was owned by the John P. McKay Insurance Trust as that fact is recorded in Paragraph 7(B) of the draft settlement agreements. Mr. Pruniski even questioned whether the trust's name included "Jr." in his email to Mr. Smith (and copied to Debtor). Debtor maintains that his attorneys knew this but he did not, and therefore, could not agree to the settlement. The Court simply finds this statement completely incredulous. All the evidence indicates that the Debtor knew the life insurance was owned by a trust but promised to "take all necessary actions" to have it assigned anyway. He cannot now claim as a defense to the entire agreement that it was impossible for him to carry this out. As stated by Williston, "[O]ne who binds himself to a contract which cannot be performed without the consent or cooperation of a third person is not relieved of liability because of his inability to secure the required consent or co-operation." C.T. Foster, Annotation, *Modern Status of the Rules Regarding Impossibility of Performance as Defense*, 84 A.L.R.2d 12 § 22

(1962) (citing 6 Williston, Contracts (Rev ed) § 1932). *See also Barcroft Woods, Inc. v. Francis,* 201 Va. 405, 111 S.E.2d 512 (1959) (" 'The rule appears to be that if one undertakes unconditionally to perform an act which is not inherently impossible, but merely requires the acquiescence or consent of a third party, or the performance of a preceding act by the latter, the nonperformance is not ordinarily excused by the fact that it subsequently proves impossible for the promisor to comply with the contract, because of the refusal of the third party to give his consent or perform the act; in other words, the contract will not, merely from the fact that acquiescence in or performance of an act by a third party must precede compliance therewith, be construed as conditional upon such acquiescence or performance.' ") (citations omitted); 17A Am.Jur.2d Contracts § 668 (2010) ("[O]ne who engages for the act of a stranger must arrange to have the act performed, and the refusal of the stranger, without the interference of the other party to the contract, is not an excuse.").

Finally, Debtor made much of the fact that there was no reply from Mr. Smith to Mr. Coleman's email of March 24, 2010, forwarding a copy of the revised settlement agreement from Mr. Pruniski. The Court finds the lack of a reply to this particular email is irrelevant because the essential settlement terms had already been agreed to—the draft sent by Mr. Pruniski made stylistic changes (primarily indenting and spacing) rather than substantive changes.

In sum, the Court finds that Debtor agreed to settle this nondischargeability

action on the terms set forth in the emails and draft settlement agreements submitted into evidence and described herein. The material terms were agreed upon on January 15, 2010, and the attorneys canceled the trial date set in this matter and proceeded to implement the settlement. When it was time to sign the agreement, the Debtor changed his mind and refused to follow through with the settlement, instead maintaining that it was impossible for him to carry out the settlement. As to this "impossibility" defense, the Court finds that impossibility was not the reason Debtor refused to go forward with the settlement, and that introducing three letters received shortly before the hearing on Hyundai's Motion to Compel into evidence is insufficient for this Court to find that no agreement was reached. Consequently, the Court finds that the parties reached an enforceable settlement contract under Arkansas law before the Debtor changed his mind and refused to follow through with the settlement.

### Bankruptcy Court Approval Under Rule 9019(a)

 Although the Court has determined that the parties entered into a binding settlement contract under Arkansas law, the Court must also discuss and distinguish recent Eighth Circuit case law holding that even if the parties have reached an agreement, it is not an enforceable settlement agreement absent bankruptcy court approval under Federal Rule of Bankruptcy Procedure 9019(a).[6] *See American Prairie Construction Co. v. Hoich,* 594 F.3d 1015, 1023 (8th Cir.2010).

 Rule 9019(a) provides, in part, *"[o]n motion by the trustee* and after

---

**6.** Apart from Rule 9019(a), certain Bankruptcy Code provisions require court approval of certain actions as being in the best interests of an estate. *See e.g.,* 11 U.S.C. §§ 363(b) (transfers of estate property outside the ordinary course of business), 365(a) (assumption or rejection of an executory contract), 544(a) (abandonment of estate property), 1129(b) (approval of chapter 11 reorganization plans).

notice and a hearing, the court may approve a compromise or settlement." (Emphasis added).[7] By its own terms, Rule 9019(a) applies to settlements reached by trustees and Chapter 11 Debtors-in-possession (*see* Rule 9001 *(11)* which defines "trustee" as including "a debtor in possession in a chapter 11 case"). In *Hoich,* the Eighth Circuit Court of Appeals made the broad statement that "a settlement or compromise in bankruptcy is not enforceable absent bankruptcy court approval." 594 F.3d at 1024. However, unlike this case which involves a dispute between a creditor and the Debtor regarding whether a debt is excepted from the Debtor's discharge, the Eighth Circuit's holding was made in the context of a Chapter 11 case in which the parties had not yet sought approval by the bankruptcy court under Rule 9019(a). *See American Prairie Construction Co. v. Hoich,* 594 F.3d at 1024. Specifically, the Eighth Circuit stated, "[i]t is a recognized principle of bankruptcy law that a bankruptcy court is required to approve any compromise or settlement proposed *in the course of a Chapter 11 reorganization* before such compromise or settlement can be deemed effective." 594 F.3d at 1024 (emphasis added).

■■■ Despite the Eighth Circuit's statements regarding the necessity of obtaining bankruptcy court approval under Rule 9019(a), the Court believes to apply that ruling to cases which do not involve a trustee or debtor-in-possession or do not affect a debtor's bankruptcy estate would be to take the ruling and the Rule itself out of context. Again, by its own terms, Rule 9019(a) applies to trustees (including debtors-in-possession) and therefore does not require parties other than a trustee or debtor-in-possession to obtain court approval of settlements that do not affect the debtor's estate, such as agreements regarding whether a particular debt is excepted from discharge.[8] Such controversies do not affect other creditors or the estate and therefore do not need the sort of notice and approval that the settlement of other controversies affecting the estate require. *See e.g., In re Hass,* 273 B.R. 45, 50 (Bankr.S.D.N.Y.2002) ("Settlement of a controversy under Section 523(a) generally affects only the particular creditor and the debtor post-petition (in a Chapter 7 case), and approval of such a compromise generally will not affect the rights of parties interested in the debtor's estate."); *In re Hall,* 2010 WL 1730684, *8 (Bankr.D.Kan. 2010) ("However, it is clear that Rule 9019 does not apply to compromises not involving the estate. As stated by one commentator 'where the proceeding in which a compromise is sought does not involve the interest of the estate at large, notice need not be given.'") (quoting 8 Norton Bankruptcy Law & Practice ¶ 167:1 (Thompson/West 2009)).[9]

7. *In re Hall,* 2010 WL 1730684, *8 (Bankr. D.Kan.2010) ("This subsection of Rule 9019 had its source in Section 27 of the Bankruptcy Act which provided that the 'receiver or trustee may, with approval of the court, compromise any controversy arising in the administration of the estate upon such terms as he may deem for the best interest of the estate.'") (citations omitted).

8. The post-Bankruptcy Code cases cited by the Eighth Circuit in *Hoich* involved settlements reached by a trustee (*Travelers Ins. Co. v. Am. AgCredit Corp. (In re Blehm Land &*

*Cattle Co.),* 859 F.2d 137, 141 (10th Cir. 1988)); *Billingham v. Wynn & Wynn, P.C. (In re Rothwell),* 159 B.R. 374, 379 (Bankr. D.Mass.1993); settlements reached in a Chapter 11 case (*In re Masters, Inc.,* 149 B.R. 289, 292 (E.D.N.Y.1992)), or involved some impact on the estate *(Bramham v. Nev. First Thrift (In re Bramham),* 38 B.R. 459, 465 (Bankr.D.Nev. 1984)).

9. The Court notes that although the language of Rule 9019(a) is permissive rather than mandatory and other courts have held that it is merely a safe-harbor provision for trustees

Although Rule 9019(a), by its own terms, does not apply to the instant case, the Court feels compelled to address the Eighth Circuit's ruling in *Hoich* because the case could broadly be interpreted as preventing the enforcement of a binding contract to settle a case under State law simply because the parties had not obtained court approval of their settlement. Despite the parties' intentions in this case to obtain court approval of their settlement, the Court finds that Rule 9019(a) does not apply to a dischargeability action between a creditor and the debtor, and therefore, no court approval is required, and any legal settlement reached by the parties is enforceable.

## CONCLUSION

The Debtor authorized his attorney to enter into a binding settlement agreement with the essential terms of that agreement being laid out in a series of emails between the parties' attorneys and in several draft settlement agreements. The Debtor subsequently changed his mind and refused to execute the written settlement agreement and follow through with his obligations under that agreement. Further, bankruptcy court approval under Rule 9019(a) is not necessary for the Court to enforce

the settlement agreement. The Debtor is therefore in breach of the settlement contract and is hereby required to execute the settlement agreement and follow through with his obligations under that agreement. For these reasons, it is hereby

**ORDERED** that the Plaintiff's *Motion to Enforce Settlement* is **GRANTED.**

**IT IS SO ORDERED.**

and not an actual requirement, the Court understands the Eighth Circuit's ruling in *Hoich* to require bankruptcy court approval under 9019(a) for a trustee or debtor-in-possession to enter into an enforceable settlement. *See American Prairie Construction Co. v. Hoich*, 594 F.3d at 1024. *Compare In re Dalen*, 259 B.R. 586, 595 –596 (Bankr. W.D.Mich.2001) ("... Rule 9019(a) is at best ambiguous as to whether court approval of a settlement is even required. It certainly is possible to educe from Rule 9019(a) the requirement that all settlements involving the bankruptcy estate be court approved. However, Rule 9019(a) itself contains no such mandate. Rule 9019(a) states simply that the court 'may' approve a compromise or settlement 'if' a motion is filed by the trustee. Nothing within Rule 9019(a) actually prohib-

its a trustee from settling a claim for or against the estate outside the purview of the bankruptcy court.") (emphasis in original); *In re Hall*, 2010 WL 1730684, *8 (Bankr. D.Kan.2010) (citations omitted) ("The scope of the rule is not settled. It has been held the rule is simply procedural and, unlike the provisions of the Act from which it is derived, is not a substantive provision requiring court approval of compromises if such a requirement does not exist in the Code itself. Some courts finds such approval permissive, not mandatory, while others find that a trustee may not enter into a binding compromise without court approval."). *See also In re Novak*, 383 B.R. 660 (Bankr.W.D.Mich.2008); *In re Telesphere Communications, Inc.*, 179 B.R. 544 (Bankr.N.D.Ill.1994).